# STATE OF LOUISIANA

## COURT OF APPEAL, THIRD CIRCUIT

## 06-765

STATE OF LOUISIANA

VERSUS

PAUL ROBERTS, JR.

**********
APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 276,876
HONORABLE JOHN C. DAVIDSON, DISTRICT JUDGE
**********

## GLENN B. GREMILLION
## JUDGE

**********

Court composed of Oswald A. Decuir, Jimmie C. Peters, and Glenn B. Gremillion, Judges.

**AFFIRMED WITH INSTRUCTIONS.**

**James C. Downs**
**District Attorney**
**Loren M. Lampert**
**Asst. District Attorney**
**9th Judicial District Court**
**701 Murray Street**
**Alexandria, LA 71301**
**(318)473-6650**
**Counsel for Plaintiff/Appellee:**
　　　**State of Louisiana**

**D. Wayne Bush**
**S. Christie Smith, IV**
**The Smith Law Firm**
**P. O. Drawer 1528**
**Leesville, LA 71496-1528**
**(337) 239-2244**
**Counsel for Defendant/Appellant:**
     **Paul Roberts, Jr.**

Gremillion, Judge.

Following a jury trial, the defendant, Paul Roberts, Jr., was convicted of second degree murder, a violation of La.R.S. 14:30.1; attempted second degree murder, a violation of La.R.S. 14:27 and 14:30.1; possession of a firearm by a convicted felon, a violation of La.R.S. 14:95.1; and possession of marijuana with intent to distribute, a violation of La.R.S. 40:966(A)(1). He now appeals raising eight assignments of error. For the following reasons, we affirm with instructions.

## FACTS

Defendant was convicted of second degree murder for the killing of Christopher Cook and the attempted second degree murder of Jose Reyna, Jr., as well as the other crimes mentioned above. These events occurred at Cook's apartment in Alexandria, Louisiana, on April 23, 2003, during a drug transaction.

Reyna, Jr. and Cook met at a halfway house in Rapides Parish where Reyna was serving time for possession of marijuana and distribution of drugs.[1] After leaving the halfway house, Reyna returned to Texas. However, he and Cook had decided to deal marijuana together. The plan was that Cook would sell the marijuana in central Louisiana, then pay Reyna for the delivery. On April 23, 2003, Reyna went to Alexandria to pick up a truck and a portion of the money Cook owed him for the most recent delivery.

Reyna testified that when he arrived at Cook's apartment there were two other men there. Cook was conducting a drug transaction with the two men. Cook

---

[1] At the time of trial, Reyna was serving sentences for money laundering and possession of marijuana with intent to distribute. He had received a sentence of seven years on each count to run concurrently.

left the room and returned with an ice chest containing four pounds of marijuana. During the transaction, Reyna and Cook were seated on a sofa on the left side of the room and the other two men on a sofa on the right side of the room. Reyna testified that "the big fellow," Kenny Bell, weighed the marijuana and the other man, Defendant, pulled out a gun. Defendant then said, "be cool, we just gonna take this and nothing's gonna happen." Reyna further testified that Bell opened the door to the apartment, and said, "blast 'em." Defendant and Bell left, taking the marijuana with them.

According to the record, Defendant shot Cook and Reyna as he was running out of the apartment. Reyna was taken to a local hospital, where he remained hospitalized for two weeks. Cook died as a result of a gunshot wound to the neck and was pronounced dead at the scene. An autopsy revealed that a bullet entered Cook's left neck, lacerated the left jugular vein and the top portion of the left lung, and exited out his back.

**SUFFICIENCY OF EVIDENCE**

In his eighth assignment of error, Defendant contends the evidence was insufficient to sustain the verdict. Since a ruling that the evidence was insufficient would necessitate an acquittal, we will address this assignment first, pursuant to *State v. Hearold*, 603 So.2d 731 (La.1992).

This court has explained:

When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195,

2

62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the Jackson standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (citing *State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

The indictment charged Defendant with second degree murder, asserting that he did kill Cook "with specific intent to kill or inflict great bodily harm; and while engaged in the commission of the offense of armed robbery" of Cook and Reyna. Additionally, he was charged with attempted second degree murder, in that he did attempt to commit second degree murder of Reyna, "with specific intent to kill and while engaged in the commission of the offense of armed robbery" of Cook and Reyna. In addition to those charges, Defendant was charged with possession of a firearm by a convicted felon and possession of a controlled dangerous substance (marijuana) with intent to distribute.

Subsequently, Defendant was convicted of each charge. Louisiana Revised Statute 14:30.1(A) defines second degree murder as the killing of a human being:

(1) When the offender has a specific intent to kill or to inflict great bodily harm; or

(2)(a) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, forcible rape, aggravated arson, aggravated burglary, aggravated kidnapping, second degree kidnapping, aggravated escape, drive-by shooting, armed robbery, first degree robbery, or simple robbery, even though he has no intent to kill or to

3

inflict great bodily harm.

Attempt is defined in La.R.S. 14:27 as follows:

> A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
>
> B. (1) Mere preparation to commit a crime shall not be sufficient to constitute an attempt; but lying in wait with a dangerous weapon with the intent to commit a crime, or searching for the intended victim with a dangerous weapon with the intent to commit a crime, shall be sufficient to constitute an attempt to commit the offense intended.

The supreme court has explained:

> To sustain a conviction for attempted second degree murder, the state must prove that the defendant: (1) intended to kill the victim; and (2) committed an overt act tending toward the accomplishment of the victim's death. La. R.S. 14:27; 14:30.1. Although the statute for the completed crime of second degree murder allows for a conviction based on "specific intent to kill or to inflict great bodily harm," La. R.S. 14:30.1, attempted second degree murder requires specific intent to kill. *State v. Huizar*, 414 So.2d 741 (La.1982). Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. La. R.S. 14:10(1); *State v. Butler*, 322 So.2d 189 (La.1975); *State v. Martin*, 92-0811 (La.App. 5 Cir. 5/31/94), 638 So.2d 411.

*State v. Bishop*, 01-2548, p. 4 (La. 1/14/03), 835 So.2d 434, 437.

Defendant makes two specific arguments: (1) that the State failed to show the specific intent element of second degree murder and attempted second degree murder, because the surviving victim, Reyna, testified Defendant's aim was "random," and (2) that there was insufficient evidence of an armed robbery, since Bell, the previously convicted co-defendant, testified that "nothing was taken." Defendant does not now allege that the State failed to prove he was the shooter.

4

At trial, Reyna testified that before the shooting Defendant was sitting down on the couch. Reyna thought that Bell was distracting them while he was weighing the marijuana. Reyna said he heard a gun cock and looked to see Defendant pointing a gun at Cook and him. It was at this point that Defendant got up and said to "be cool" and that they were going to take the marijuana and nothing else was going to happen. However, according to Reyna, it was at this point that Bell told Defendant to "blast 'em" and Defendant started shooting. Reyna testified that he was hit three times and Cook once. He described the shooting as "random."

Reyna's testimony clearly showed that Defendant pointed a pistol at Reyna and Cook, then fired it, killing Cook and hitting Reyna three times. Further, Defendant's actions support a finding of specific intent. "Deliberately pointing and firing a deadly weapon at close range are circumstances which will support a finding of specific intent to kill." *State v. Brown*, 03-897, p. 22 (La. 4/12/05), 907 So.2d 1, 18. Therefore, the evidence supported a finding that Defendant specifically intended to kill Reyna and Cook beyond a reasonable doubt. For this reason, the first portion of Defendant's argument fails.

Defendant's second argument is that the State failed to prove that he committed or attempted to commit an armed robbery at the time of the shootings. Having determined that specific intent was established pursuant to La.R.S. 14:30.1(A)(1), we find that there was no need for the State to prove that Defendant was committing an armed robbery pursuant to La.R.S. 14:30.1(A)(2)(a).

Nevertheless, the jury heard Reyna testify that Defendant and Bell took approximately four pounds of marijuana as they left Cook's apartment. During

cross-examination, Bell testified that he did not steal anything from the apartment, nor did he see Defendant steal anything. It is quite possible that the jury found Reyna more credible, and it is well-settled that such a determination is within its purview. Thus, Defendant's second argument under this assignment of error lacks merit.

For the reasons discussed above, this assignment of error is without merit.

## JOINDER OF CHARGES

In his first assignment of error, Defendant argues that the lower court erred by refusing to sever the charges prior to trial. In his motion below, Defendant argued that joinder of the offenses was prejudicial, that the charges were not part of a "continuum," and that the State had joined them in order to portray him in a bad light. However, he did not seek severance of the second degree murder and attempted second degree murder charges. The State filed a written opposition to the motion, arguing that it was untimely and that the offenses all arose out of the same transaction or occurrence. The trial court denied the motion. The argument in the trial court centered on the case of *State v. Morris*, 99-3075, pp. 3-7 (La.App. 1 Cir. 11/3/00), 770 So.2d 908, 913-15, *writ denied*, 00-3293 (La. 10/12/01), 799 So.2d 496, *cert. denied*, 535 U.S. 934, 122 S.Ct. 1311 (2002) (emphasis added), which we set forth at length below:

> Defense counsel complained of *the joinder of the felon in possession of a firearm count* through various means, including a motion to quash the charge and several motions to sever the offenses. During trial, counsel vehemently objected to the introduction of the evidence and even refused to cross-examine the State's witnesses whose testimony established the prior conviction. On appeal, defendant now argues that the lack of jurisprudence on the issue conclusively establishes that trial courts routinely sever these charges before trial; or,

6

if the trial court refuses a motion to sever, an appellate court will reverse that ruling on supervisory review.

We find defendant's arguments unpersuasive. We have found no published jurisprudence directly addressing this issue. However, while some appellate decisions incidentally indicate that a felon in possession charge was severed from other offenses before trial, other decisions reflect that a felon in possession charge was jointly tried with other offenses or even tried in a separate proceeding, but at the same time as other offenses.

Louisiana Code of Criminal Procedure article 493 provides for the joinder of two or more offenses, as follows:

> Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan; provided that the offenses joined must be triable by the same mode of trial.

"If it appears that a defendant or the state is prejudiced by a joinder of offenses in an indictment or bill of information or by such joinder for trial together, the court may order separate trials, grant a severance of offenses, or provide whatever other relief justice requires." LSA-C.Cr.P. art. 495.1.

A defendant in any case bears a heavy burden of proof when alleging prejudicial joinder of offenses as grounds for a motion to sever; factual, rather than conclusory, allegations are required. *State v. Davis*, 92-1623, p. 9 (La.5/23/94), 637 So.2d 1012, 1019, *cert. denied*, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994). In ruling on a motion for severance, the trial court must weigh the possibility of prejudice to the defendant against the important considerations of economical and expedient use of judicial resources. *State v. Brooks*, 541 So.2d 801, 804 (La.1989). An appellate court will not reverse the trial court's ruling denying a motion for severance absent a clear showing of prejudice. *State v. Machon*, 410 So.2d 1065, 1068 (La.1982); *See State v. Allen*, 95-1515, p. 5 (La.App. 1 Cir. 6/28/96), 677 So.2d 709, 713, *writ denied*, 97-0025 (10/3/97), 701 So.2d 192.

Because all of the charged offenses were triable by the same number of jurors and required the same concurrence, joinder was not improper; because the use of a weapon is an essential element of the

7

armed robbery charges, evidence that defendant was armed also was not improper. Thus, the only question is whether the introduction of evidence of defendant's prior conviction for first degree robbery was so prejudicial that the trial court's failure to sever that count was an abuse of discretion.

As a general rule, evidence of criminal conduct that takes place in a series of events is admissible at the trial of one of the offenses. *See* LSA-C.E. art. 404(B). *See also State v. Colomb*, 98-2813, pp. 1-2 (La.10/1/99), 747 So.2d 1074, 1075. Any time the State introduces evidence of other criminal activity by the accused, the possibility exists that the trier of fact will be affected to some degree by the evidence; for that reason, the State must be mindful of the circumstances in which it elects to try a charge of felon in possession of a firearm with other substantive offenses to insure that justice is served. Nevertheless, there is no absolute ban on the introduction of evidence of other unrelated crimes, including felony convictions; instead, statutory and jurisprudential guidelines establish the circumstances under which this evidence is admissible. *See* LSA-C.E. arts. 403; 404(B). *See also State v. Prieur*, 277 So.2d 126, 130 (La.1973). Herein, the jury was properly instructed, after the presentation of the evidence and again during the general instructions, that the evidence of defendant's prior conviction was admitted only to establish the elements of one of the charged offenses and not as evidence bearing on defendant's character.

. . . .

In any event, even if we were to find the trial court erred in refusing to sever the felon in possession of a firearm charge, the erroneous admission of other-crimes evidence is a trial error *subject to harmless-error analysis on appeal. State v. Johnson*, 94-1379, p. 15 (La.11/27/95), 664 So.2d 94, 101. The test for determining whether an error is harmless is whether the verdict actually rendered in this case "was surely unattributable to the error." *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993); *Johnson*, 94-1379 at 14, 664 So.2d at 100.

The State's evidence included testimony by: two customers, neither of whom was able to positively identify defendant as a perpetrator, but who both testified Molden was accompanied by another man dressed totally in black; defendant's two accomplices, who admitted that they planned and participated in the robbery with defendant; and the store manager, who testified he was absolutely positive defendant was the person who held a gun to his head and threatened to kill him while he tried to open the safe. Given the extensive direct evidence of the armed robberies, the verdicts on those

charges could not have been related to evidence of any prior conviction of defendant.

There were no eyewitnesses to the abduction and murder of Ms. Purdue. However, as discussed later, defendant was clearly connected to those offenses through circumstantial evidence. Any possibility that the jury was prejudiced against defendant because of his prior conviction is so remote as to render the verdicts surely unattributable to the evidence.

As an aside, we note that the supreme court has applied the harmless error analysis to cases involving joinder/severance problems. *See e.g., State v. Deruise*, 98-0541 (La. 4/3/01), 802 So.2d 1224, *cert. denied*, 534 U.S. 926, 122 S.Ct. 283 (2001); and *State v. Strickland*, 94-0025 (La. 11/1/96), 683 So.2d 218, *questioned on other grounds in State v. Joseph*, 03-1445 (La.App. 5 Cir. 5/26/04), 875 So.2d 1011.

As noted in our sufficiency of evidence review of the murder and attempted-murder convictions, the State presented a strong case against Defendant, which included the eyewitness testimony of Reyna, the surviving victim, and the testimony of Bell, Defendant's accomplice. Regarding the conviction for possession of marijuana with the intent to distribute, Reyna testified that Defendant and Bell absconded from the crime scene with four pounds of marijuana. This testimony alone was sufficient to establish that Defendant had physical possession of the marijuana. Also, in his statements to police, Defendant admitted to being a drug dealer, and to being present in the victim's apartment while a drug transaction was taking place. In addition, Bell testified that the marijuana was worth $700 per pound. Although none of the officers testified regarding whether the amount of marijuana involved was either consistent or inconsistent with personal use, we believe that the jury had

9

sufficient facts before it to infer that Defendant had the intent to distribute the marijuana taken by him and Bell.[2] In essence, it was reasonable for the jury to infer that Defendant's act of shooting two men (killing one and critically injuring the other) and taking $2800 worth of marijuana from the dead victim's apartment, was not consistent with an intent to use the drugs merely for personal use.

Regarding the conviction for illegal possession of a firearm by a convicted felon, Reyna's testimony established that Defendant possessed a firearm. The State established Defendant's status as a convicted felon via the testimony of Lyndel Willis, a probation and parole agent from the Department of Corrections. Also, we note that the trial court gave a limiting instruction regarding the evidence that Defendant had a prior felony conviction.

In our opinion, the evidence in the present case is at least as strong as the evidence presented in *Morris*. Thus, we find that the trial court did not commit error in denying the motion to severe. Even if the trial court erred in denying the motion, the error was harmless since the verdicts were surely unattributable to the joinder of the offenses. Therefore, this assignment of error is without merit.

## SHACKLED DEFENDANT

In his second assignment of error, Defendant argues that the trial court erred by allowing him to be shackled during trial. Both sides note that ordinarily a

---

[2] For appellate analysis of the intent issue, this court has employed a five-factor test: "(1) whether the accused ever distributed or attempted to distribute drugs; (2) whether the drugs were in a form usually associated with possession for distribution to others; (3) whether the amount of drugs created an inference of an intent to distribute; (4) whether expert or other testimony establishes that the amount of drugs found in the accused's possession is inconsistent with personal use only; and (5) whether there was any paraphernalia, such as baggies or scales, evidencing an intent to distribute." *State v. Davis*, 05-543, p. 9 (La.App. 3 Cir. 12/30/05), 918 So.2d 1186, 1192, *writ denied*, 06-0587 (La. 10/13/06), 939 So.2d 372 (*citing State v. House*, 325 So.2d 222 (La.1975)).

defendant should not appear before a jury in prison restraints. Defendant acknowledges that a defendant may be visibly restrained in some circumstances, but argues that no such circumstances existed in the present case. In response, the State argues that he must show prejudice to obtain relief on appeal, and that he has failed to do so.

However, we find that this assignment of error presents us with nothing to review. Both sides agree the restraint device was under Defendant's clothes, but Defendant argues that part of it was still visible, and that the device was also audible. The State contends the device was invisible to the jury. As the record contains no evidence, exhibits, or proffers depicting the appearance or sound of the device, there is no practical way for us to review the factual issue of whether the restraint device was visible or audible to the jury. Accordingly, the issues raised under this assignment of error would be better addressed in the post-conviction process, where the record can be more fully developed. La.Code Crim.P. art. 924, et seq.

## DEFENDANT'S CHALLENGES FOR CAUSE

In his third assignment of error, Defendant argues that the trial court erred by denying his challenges for cause of four venire members. He adds that the denial of these challenges caused him to prematurely exhaust his peremptory challenges.

Louisiana Code of Criminal Procedure Article 797 governs challenges for cause. It states, in pertinent part:

> "The state or the defendant may challenge a juror for cause on the ground that:
>
> . . . .

11

(2) The juror is not impartial, whatever the cause of his partiality.  An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;

. . . .

(4) The juror will not accept the law as given to him by the court;. . . ."

Also, La.Code Crim.P. art. 800(A) states:  "A defendant may not assign as error a ruling refusing to sustain a challenge for cause made by him, unless an objection thereto is made at the time of the ruling.  The nature of the objection and grounds therefor shall be stated at the time of objection."

The supreme court has explained:

A trial court is vested with broad discretion in ruling on challenges for cause, and its rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion. *State v. Cross*, 93-1189, p. 7 (La.6/30/95), 658 So.2d 683, 686; *State v. Robertson*, 92-2660, p. 4 (La.1/14/94), 630 So.2d 1278, 1281. Prejudice is presumed when a challenge for cause is denied erroneously by a trial court and the defendant ultimately exhausts his peremptory challenges. *Robertson*, 92-2660 at p. 3, 630 So.2d at 1280; *State v. Ross*, 623 So.2d 643, 644 (La.1993).  An erroneous ruling depriving an accused of a peremptory challenge is a substantial violation of his constitutional and statutory rights and constitutes reversible error.  *Cross*, 93-1189 at p. 6, 658 So.2d at 686; *State v. Bourque*, 622 So.2d 198, 225 (La.1993).  "A challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably implied." *State v. Jones*, 474 So.2d 919, 926 (La.1985).  However, a trial court does not abuse its discretion when it refuses to excuse a prospective juror on the ground he is not impartial where, after further inquiry or instruction, the potential juror has demonstrated a willingness and ability to decide the case impartially according to the law and evidence. *Robertson*, 92-2660 at p. 4, 630 So.2d at 1281.

*State v. Scott*, 04-1312, pp. 16-17 (La. 1/19/06), 921 So.2d 904, 921, *cert. denied,* 75

U.S. 3167, 127 S.Ct. 137 (2006).

Defendant exhausted his peremptory challenges, and excused each of the prospective jurors he claims should have been excused for cause with a peremptory challenge. Accordingly, we discuss the merits of each of the four challenges for cause that he raises on appeal.

**David Vanderhoeven**

Defendant first complains of the denial of his challenge for cause against venire member David Vanderhoeven. The trial court denied the challenge, finding Vanderhoeven would apply the law. The trial court noted Defendant's objection for the record. The grounds for said objection were not stated for the purposes of Article 800. However, in the context of the proceedings, we recognize that the grounds for the objection could reasonably be considered to be identical to the grounds for the initial challenge for cause. Further, a review of the jurisprudence indicates that we have not applied Article 800 strictly. For example, in *State v. Hundley*, 99-1156 (La.App. 3 Cir. 3/22/00), 760 So.2d 417, we noted the lack of objections to the challenges at issue, but proceeded to analyze the assignment of error in the interest of justice. *See also State v. Garrick*, 02-712 (La.App. 3 Cir. 6/30/04), 879 So.2d 401, *writ denied*, 04-1969 (La. 3/17/05), 896 So.2d 986.

Regarding the substance of Defendant's assignment of error, we have carefully reviewed the entirety of Vanderhoeven's voir dire examination. While some of his answers were ambiguous regarding his ability to apply the law as given to him as required by La.Code Crim.P. art. 797(4), the totality of his voir dire indicates that the trial court did not abuse its discretion in rejecting the challenge for cause.

Vanderhoeven is married and the father of two children. Both he and his wife are employed, she for a medical company and he as a computer drafter and designer of steel structures for electrical substations. They live in Pineville. He has been the victim of a burglary and the burglar was arrested and convicted. He still thinks about it and is concerned about his security and the safety of his family and belongings. He wanted to serve, feeling it was his civic duty, stating that "its people like us are gonna protect the rest of society from criminals" as well from prosecutors who want to put people in jail "undeservedly." He explained that he does not believe that everyone who is brought to trial by the State is guilty simply because they are on trial and everyone on trial is not, in fact, a criminal. Vanderhoeven thinks that protecting society is convicting people that are actually guilty of crimes and that not everybody who the D.A. brings to trial is guilty. He believes that the State should have to prove each element of the crime beyond a reasonable doubt. Vanderhoeven says that the way you can tell when someone is telling the truth is by their demeanor, "[t]he way they act when they're telling their story."

Under questioning by Defendant, Vanderhoeven admitted that he was "strong minded" in that when he made his mind up it was doubtful that he could change it even in jury deliberations. He said it makes him feel that he was following his conscience and that once he made his mind up, that was his decision. This concerned the trial court enough that it recalled Vanderhoeven for further examination. When questioned by the State, he explained that he did not come to court with an agenda to convict somebody and that if the State failed to prove each element of the case beyond a reasonable doubt he would vote not guilty. When asked

14

about his strong mindedness, he said he would listen to what the other jurors said before he would render his final vote. In this regard, the following transpired between the State and Vanderhoeven:

BY [THE STATE]:

Now, if at the end of the evidence, your mind is, you're firmly convinced you know exactly what happened or didn't happen, one way or the other, ahm, you're definite in your belief as to what did or didn't happen, what was or was not proved. When you go into the back with your fellow jurors, if the Judge instructed you that it is your duty, under your oath, to consult with the fellow jurors and listen to what they have to say, and if it's necessary reexamine your own views, but do not surrender your own views unless you're firmly convinced you're wrong, and that's exactly what is said, by the way, ah, you could follow that instruction?

BY VANDERHOEVEN:

Do not surrender my own views unless, unless what?

BY [THE STATE]:

Unless you're firmly convinced you were wrong.

BY VANDERHOEVEN:

Sure.

It appears that Vanderhoeven would surrender his views if he were convinced he was wrong. When re-examined by Defendant, Vanderhoeven was asked if once he made his mind up before he began deliberations, could he change it? He responded, "Ah, I'm sure it is possible." Asked again if he made his mind up, would he be able to re-examine his views in relation to what others on the jury said, he said, "I possibly could, yes sir. Not to say that that's gonna change my mind, though." Further questioning followed by Defendant:

15

BY [DEFENDANT]:

What happens if you were so convinced of your position, that you made up your mind while the State was still presenting its evidence?

BY VANDERHOEVEN:

I don't know that that'll happen.

BY [DEFENDANT]:

Could that happen?

BY VANDERHOEVEN:

It's possible.

Finally, this exchange occurred between Vanderhoeven and the State and the trial court:

BY [THE STATE]:

If you made up your mind at point C, and there's still evidence, D, E, F and G to come in, would you still listen to that evidence?

BY VANDERHOEVEN:

Yes, I would listen to it.

BY [THE STATE]:

And if it changes your mind from point C, to point G, ah, something completely different comes out, and your mind is changed, is that possible?

BY VANDERHOEVEN:

Anything can happen.

BY [THE STATE]:

Okay.

BY VANDERHOEVEN:

16

I merely rendered that today to explain to him the type of person that I am. And, and the way that I believe and, and my, my conscience.

BY [THE STATE]:

Thank you very much.

BY THE COURT:

Let me tell you what my concern is. What, what I, what my concern is, it's, it's quite simple, I wanta make sure that, and, and I appreciate you for your honesty, I want you to know that. This is not a test that you fail or pass. But, what you get to do as a juror is you actually get to sit in the back and, unlike me, you actually get to discuss your decision with other people. When I render those decisions, I don't discuss 'em with anybody, it's just me. And that's an important part of the process. And, I, you know, I'm a little concerned when you indicate[d] that once you made your mind up, it, you were done. Because the way the jury process works, is you're supposed to engage in that conversation in the back, and then you guys, after you elect, you elect a foreman, you engage in the conversation, then you, you, you vote. Okay? Ah, did, did I misread you, because my understanding was, once you made your mind up, that was it. And there really wasn't any deliberation.

BY VANDERHOEVEN:

In most circumstances, when I make a decision, that's the decision I go with.

BY THE COURT:

Okay. Have you ever sat on a jury before?

BY VANDERHOEVEN:

No sir, I haven't.

BY THE COURT:

Did you under, understand the process here?

BY VANDERHOEVEN:

Yes sir.

BY THE COURT:

I mean, this isn't like going to buy a car.

BY VANDERHOEVEN:

Right.

BY THE COURT:

Or making a business deal, you know. Or, or, or just in any decision you would make in a personal relationship.

BY VANDERHOEVEN:

Correct.

BY THE COURT:

Okay. I appreciate your honesty. Thank you, sir. Okay, you can step to the back.

The trial court in its broad discretion denied the challenge for cause and Defendant used a peremptory challenge to exclude Vanderhoeven from the jury. Vanderhoeven said that he could follow the judge's instructions and that while he is "strong minded" he would listen to his fellow jurors, and if convinced he was wrong, change his mind, albeit he would hold to his views until that happened. He wanted to serve on the jury to protect society, but expressed no agenda to vote guilty just because a defendant was charged by the State and put on trial.

In *State v. Kang*, 02-2812 (La. 10/21/03), 859 So.2d 649, a venire member said he was a next door neighbor to a high ranking police officer and would "probably tend to put more weight on the Deputies, especially if it's on things they observed." *Id.* at 652. The Fourth Circuit Court of Appeal had reversed the conviction, but the supreme court granted a writ of certiorari and reversed the court

18

of appeal finding that it did not give sufficient deference to the trial court. The *Kang* court stated:

> We have repeatedly held that a trial judge is vested with broad discretion in ruling on challenges for cause, and only where it appears, upon review of the voir dire examination as a whole, that the judge's exercise of that discretion has been arbitrary or unreasonable, resulting in prejudice to the accused, will this Court reverse the ruling of a trial judge[.]

*Id.* at 654 (citing *State v. Lee*, 93-2810 (La. 5/23/94), 637 So.2d 102, 108, which quoted *State v. Passman*, 345 So.2d 874, 880 (La.1977)).

Accordingly, the supreme court in *Kang* stressed the great deference that reviewing courts should accord to trial court decisions regarding challenges for cause. Further, the supreme court recently rendered *State v. Leger*, 05-0011 (La. 7/10/06), 936 So.2d 108, where the defendant in a first degree murder case assigned as error the trial court's refusal to allow challenges for cause for several prospective jurors. In one case, the defendant complained that where a venire member stated she would automatically vote for the death penalty if the defendant was found guilty of first degree murder, the trial court was in error when it found that the State had sufficiently rehabilitated the venire member. In rendering on this issue, the supreme court wrote:

> "While the reviewing court must carefully review the record of voir dire for abuses of discretion, it need not and should not attempt to reconstruct the voir dire by a microscopic dissection of the transcript in search of magic words or phrases that automatically signify either qualification or disqualification." *State v. Lucky*, 96-1687 p. 7-8 (La. 4/13/99), 755 so.2d 845, 851, *cert. denied*, 529 U.S. 1023, 120 S.Ct. 1429, 146 L.Ed.2d 319 (2000); *see State v. Ball*, 2000-2277, p. 21 (La. 1/25/02), 824 So.2d 1089, 1108, *cert. denied*, 537 U.S. 864, 123 S.Ct. 260, 154 L.Ed.2d 107 (2002) (prospective juror's use of the term "automatically" was troubling, but more likely merely mirrored the defense counsel's use of the term in the question put to her). This court must look to entire voir dire on this subject matter and not individual responses.

*Id.* at 161.

While Vanderhoeven may not have clearly spoken the "magic words" that he could listen to the evidence and make his mind up only after all the evidence was in and after due deliberations with his fellow jurors, the trial court did not abuse its broad discretion in refusing to allow the challenge for cause for him. After our review of the entire voir dire, we find that there is no merit in this assignment of error.

**Suellyn Hudson, Nicole Dossey, and Geraldine Pringle**

Next, Defendant argues that the trial court erred by denying his challenges for cause against Suellyn Hudson, Nicole Dossey, and Geraldine Pringle. Again, we have carefully considered the record regarding each of these prospective jurors. Hudson is married. She is a math teacher at Brame Middle School and her husband is a nurse at Cabrini Hospital. She has three adult children and a fifteen year-old stepson. She has been the victim of a house burglary. Her students are very important to her and she expressed a desire for the court to consider that in deciding whether she should be a juror on this case. Hudson, who has taught school for twenty-eight years, said she knew one of the State's witnesses and one of the State's witness's son. The State's witnesses she knew are police officers. She taught Officer Gary Mouliere and Detective Cedric Green's son, both of whom she held in high regard. While she said she would believe Mouliere "over a student that was not so good in my classroom," and that Green's son was very good in her room and "a darling child," she told the trial court that she "probably could" set that aside and follow the trial court's instructions to "not consider that in determining, ah, the credibility of a witness, or anything other than the evidence in this case." She showed

20

an understanding of direct and circumstantial evidence, and of the necessity of proving each element of crime beyond a reasonable doubt in order to bring in a verdict of guilty. Under examination by Defendant, she remembered that her first husband, who had died eleven years earlier, had been an accountant for the Rapides Parish Sheriff's Office before his death. After that, this exchange occurred between counsel for Defendant and several jurors:

> BY [DEFENDANT]:
>
> Okay. Well, let's talk about the police for a little while. What do you think about cops? Everybody's got feelings about police right? What's the job of the police? Mr. Schneider?
>
> BY MR. SCHNEIDER:
>
> To serve and protect, to (interrupted)
>
> BY [DEFENDANT]:
>
> That's what it says on the car for sure, right? And in general I would agree. Ah, the police's job is to serve and protect. Ahm, would you believe somebody, ahm, simply, would you believe somebody, if a police officer told you that's the guy that I saw do something, ah, Ms. Hudson, would you have a tendency to believe him?
>
> BY MS. HUDSON:
>
> Probably.
>
> BY [DEFENDANT]:
>
> I mean, I (interrupted)
>
> BY MS. HUDSON:
>
> Yeah.
>
> BY [DEFENDANT]:
>
> I hear you.

21

BY MS. HUDSON:

I mean, we're supposed to trust our policeman aren't we?  I mean, I would like to think I could trust my policemen.

BY [DEFENDANT]:

I understand.  And, Ms. Pringle, if a police officer said, you know, that, that's the guy that I saw snorting coke, would you have tendency to believe?

BY MS. PRINGLE:

My question dissection be, well why didn't you arrest 'im?

BY [DEFENDANT]:

And the answer might be, perhaps and did, and that's why you would be hearing 'im say, that's the guy that, ah, I saw commit this crime.

BY MS. PRINGLE:

If I did not know that I would ask 'im.

BY [DEFENDANT]:

So, you're telling us, yes, you'd have a tendency to believe.

BY MS. PRINGLE:

I would.

BY [DEFENDANT]:

And let's talk about, then, what that's gonna tell us.  Would you have a tendency to believe a police officer over someone else, because she was a police officer, this is a police officer, giving the testimony?  All other things being even.  Two people saying two things, that couldn't both be true at the same time, one being a police officer, one not being a police officer, what do you think, Ms. Hudson?

BY MS. HUDSON:

Umm, that's pretty tough.  I guess it was prob, would probably be who convinced me the most.  Probably in my own mind, I probably, and I'm being honest, I probably would believe the policeman over just a regular

22

person off the street.

BY [DEFENDANT]:

I hear you, I mean, (interrupted)

BY MS. HUDSON:

And that's just being honest.

BY [DEFENDANT]:

Ms. Dossey, you're nodding your head yes, too?

BY MS. DOSSEY:

Yes.

BY [DEFENDANT]:

Natural inclination right?

BY MS. DOSSEY:

Right.

When asked what she thought about a person who would not testify on his behalf, she indicated that person must have a lot of confidence in his lawyer if he did not speak up to defend himself and "then in my head that would play out the fact, the possibility that person is guilty."

Defendant made a successful challenge for cause against another venire member, before he challenged Hudson for cause. The challenge was based on the fact that Hudson had taught one of the witnesses and expressed the opinion that she would believe him over another student who was not so good. Defendant further argued to the trial court that it should consider that statement:

> . . . [I]n relation to her other statement that she would have a tendency to believe officers, ah, over non officers generally, well, there's going to be an

officer whom she taught, whom she trusts, testifying.  I think that, that she, patently she would try, but she would have difficulty, ah, in disbelieving the things that that officer might say.

The State then announced that the witness Hudson taught, Officer Mouliere, probably would not testify, and in fact, he did not testify.

The trial court found Hudson had been rehabilitated over the course of voir dire, and denied the challenge.  Defendant did not lodge an objection to the court's ruling on Hudson, as well as the court's ruling on the cause challenges to Dossey and Pringle; however, we shall address each matter in the interest of justice. *See, e.g., Hundley*, 760 So.2d 417.  Further, we note that Defendant raised other concerns about these prospective jurors that were not included in his challenge for cause.  These new grounds will not be considered, pursuant to Article 800, due to the practical consideration that the trial court did not have an opportunity to address them at a time when any errors could have been remedied. Thus, we will limit our review to the concerns Defendant raised at trial.

To recap, during voir dire, Hudson stated she would be inclined to believe  potential police witnesses because of her relationship to them as a former student and the father of a former student.  When asked if she could put such an inclination aside, pursuant to the court's instructions on the law to be applied, she replied that she "[p]robably could."  As Defendant noted in his challenge, Hudson later expressed a tendency to assign greater credibility to police officers than to other witnesses.  Our review of the voir dire transcript does not reveal any attempt by the State or the trial court to rehabilitate Hudson on this issue.

The next challenge which Defendant claims the court erred in denying

is against Dossey. She is married, a first grade teacher, and her husband works at Cabrini Hospital managing the cardiac rehabilitation unit and radiology. They have one child, a two-year-old daughter, and they live in Boyce. She and her husband were the victim of a car burglary about five years before. She said she would have trouble believing a career criminal, but accepts the fact that the State has the burden of proof and that the burden never shifts to the defendant to prove his innocence. She believes that the State must prove each and every element of a crime beyond a reasonable doubt and if the State fails to prove each element then she would have to vote not guilty. Dossey admitted some confusion about whether or not the jury would be required to find the defendant guilty on all of the charges for him to be guilty on any of the charges. This seemed to be explained to her satisfaction by counsel for Defendant because she was not questioned about it any further following the explanation. She teaches with the wife of a law enforcement officer. Although Dossey indicated that she could follow the trial court's instructions, as reflected above she indicated it would be a "natural inclination" to believe a police officer over a person who is not a police officer. When asked about the defendant's right to not have to testify, she said she would draw on her experience with her first graders who refuse to answer her questions regarding minor discretions in her classroom.

This exchange occurred:

BY MS. DOSSEY:

Right. And, I'm talking about what she was just talking about. Like when we teach school, if there's a student in our class, even with my first graders, if someone accuses them of doing something, and they won't talk back to me and tell me anything, and they're looking around the room, and not . . . I have to assume that, well, okay, then you must've thrown the crayon across the room, because you're not telling

25

me otherwise. And, I thought of that because, there was a little boy who actually was in my class last year, and his teacher sent 'im up to the office, because he wouldn't speak up. He wouldn't say what happened or anything, he just sat there. And so, I guess she probably got frustrated whit 'im, because, and when you can't get information out of that person you don't know, you don't know anything and it's hard to tell, it's hard to judge, if they won't say anything for themselves.

BY [DEFENDANT]:

Indeed. Indeed, absence of evidence, right?

BY MS. DOSSEY:

Right.

BY [DEFENDANT]:

Would the, the absence of the Defendant providing you with some evidence make you think he was more likely than, it might be more likely that he might be guilty.

BY MS. DOSSEY:

It would make me think about it a little harder.

Obviously referring to her first graders, Dossey said she could tell when someone was lying because "they won't look at you," they are "fidgety," and their stories change from the time they are outside and when they get back in the classroom.

Defendant challenged Dossey for cause claiming he had concerns about her feelings about a "witness who would not testify for himself," and "that a police officer's testimony, ah, is more believable than someone else's absent other evidence." After a brief argument, the trial court denied the challenge without reasons, and as we have stated, Defendant did not object.

26

Finally, Defendant challenged Pringle for cause and the trial court denied that challenge. She is a retired secretary to the Bishop of the Episcopal Diocese of Western Louisiana and her husband is also retired. He worked for Walker-Roemer Dairies and was a self-employed nurseryman. They have three adult children and one of them, their forty-six-year-old daughter, works for the Rapides Parish Sheriff's Office in evidence. She also has a grandson that works for the Sheriff's Office as a dispatcher. Neither of them were involved in this case in any way. She said she did not think that her child and grandchild working in law enforcement would factor into her considering the evidence in this case. She said she could give both sides a fair trial and decide the case based on the evidence and not the fact that she has relatives in law enforcement. She recognized the name of one of the witnesses as being a friend of her daughter and grandson, but said she "wouldn't recognize the young man if I'd see 'im." At the time of the trial, Pringle had not seen her daughter or grandson in about three weeks although she talks to them once or twice a week.

She said she would have a problem with the death penalty saying, "I am not qualified by God to sit in judgment on that person and say he must die." When it was explained to her that this was not a death penalty case and that she was not judging his salvation or his righteousness, she said she could judge whether the defendant committed the act of second degree murder.

When questioned by Defendant, she had some problems understanding that there must be proof of all of the elements of the crime beyond a reasonable doubt, but when it was explained to her in more detail, it was apparent that she finally understood. Pringle also stated that, "if the person does not speak in his own, or their

27

own behalf, my first thought is, they're hiding something" when questioned about a defendant's right not to testify. When asked how she could tell if someone was not telling the truth, she recalled her children and said they would not look at her and blame someone else. She said she is a very trusting person, but once she finds out that someone has not told her the truth, she will not believe them anymore.

The trial court evidently felt that these three ladies could apply the law and that they would not unreasonably believe law enforcement officers over lay witnesses, even though each of them expressed some inclination to assign greater credibility to law enforcement officers and to decide the case impartially according to the law and the evidence. Initially, we reviewed a number of cases (some offered by Defendant in his brief) indicating that when a potential juror seemingly favors a law enforcement witness over lay witnesses, the trial court is obliged to excuse that person for cause. However, we find those cases are not determinate in the instant case and can be easily distinguished from it.

We begin our analysis by recalling the black letter law we cited earlier in *Scott*, 921 So.2d 904, that is, "prejudice is presumed" when a trial court erroneously denies a challenge for cause and the defendant ultimately exhausts his peremptory challenges. *See Kang*, 859 So.2d 649. "This is because an erroneous ruling depriving an accused of a peremptory challenge violates his substantial rights and constitutes reversible error." *Id*. at 652. We are, therefore, reminded that for an error to warrant a reversal, the defendant must show: "(1) the erroneous denial of a challenge for cause; and (2) the use of all of his peremptory challenges." *Id*. In this case, as we have noted, Defendant exercised all of his peremptory challenges.

28

We have reviewed the following cases wherein the appellate courts reversed the trial court's decision denying challenges for cause. In each case, the appellate court reversed the defendant's convictions. In the armed robbery case of *State v. Hallal*, 557 So.2d 1388 (La.1990), the venire member who was not excused for cause was the wife of a fifteen-year veteran of the Vernon Parish Sheriff's Office and knew five of the police officer witnesses. The law officers testified, among other things, relative to an unrecorded confession. The venire member testified that she would believe these witnesses "[n]ot because they were law enforcement officers, but because I know them[,]" and that "I just feel like the ones that I know are honest people . . . and I don't think they would lie." *Id*. at 1389.

The potential juror in *State v. White*, 574 So.2d 561 (La.App. 3 Cir. 1991), cited by Defendant, actually had done legal work for the District Attorney's Office, knew the District Attorney and several of the Assistant District Attorneys, and had a number of friends who were law enforcement officers. He said that it was more likely that a police officer would tell the truth rather than someone else, and was never rehabilitated on this issue. That case, distribution of a counterfeit controlled dangerous substance, involved conflicting testimony between the law enforcement officers and the defendant's witnesses.

In *State v. Jones*, 623 So.2d 877 (La.App. 1 Cir.), *writ denied*, 629 So.2d 419 (La.1993), a prospective juror had been employed as an administrative assistant by the Louisiana State Police for twelve years. During voir dire, the prospective juror stated that she would do her best to be fair. She later indicated that her acquaintance with people in law enforcement could cause her to favor the state. However, Bishop

29

then informed the trial court that if the state had not proven its case she would not vote guilty and she would attempt to render the fairest verdict she could based on the facts presented. Our colleagues on the First Circuit Court of Appeal noted that Bishop never expressly stated she could put aside her bias. The court went on to find that her statement that she would "do her best" to give the defendant a fair and impartial trial was not sufficient and reversed the defendant's convictions and sentences for aggravated rape and aggravated burglary.

We also reviewed *State v. Mathis*, 95-0862 (La.App. 4 Cir. 6/5/96), 675 So.2d 1217, *writ denied*, 96-1710 (La. 3/21/97), 691 So.2d 79, where the defendant was convicted of possession of cocaine. Here again, the police officers testified as fact witnesses and their testimony was in direct conflict with that of the defendant and his witnesses. During voir dire, two prospective jurors said they would find the police officers more credible than other witnesses, and were not rehabilitated. One of them was married to a police officer. Both stated they could be impartial, but repeated the belief that police witnesses are more credible than others. The *Mathis* court held that the trial court abused its discretion in denying the challenges for cause, reversed the conviction, and remanded for a new trial.

In *State v. Paul*, 99-92 (La.App. 5 Cir. 5/19/99), 738 So.2d 1128, the defendant was charged with distribution of cocaine. He challenged four prospective jurors for cause. During questioning by the defendant, a venire member indicated that the testimony of a police officer would be more accurate than that of a non-police officer because a police officer "is at a higher standard." *Id.* at 1130. Three other prospective jurors expressed similar views. The court of appeal noted that neither the

30

state nor the judge attempted to rehabilitate the prospective jurors after they voiced their bias in favor of police officers. Further, the appellate court stated, "Given that the state's case was based entirely on the testimony of police officers, the potential jurors' general attitudes toward law enforcement officers were highly relevant." *Id*. The appellate court also noted that the prospective jurors never expressly stated that they would set aside their biases and give the defendant a fair trial. Therefore, it held that the trial court's failure to grant the defendant's challenges for cause was an abuse of discretion.

As we have said, each of those cases can be distinguished from this case. None of the venire members in this case, even Pringle, have the relationship with law enforcement officers that existed in *Hallal*, *White*, and *Jones*. Although Pringle had a daughter and grandson working in law enforcement, neither testified in this case and had not discussed it with her. She knew no other law enforcement officers well enough to even recognize them. While it is true that Hudson and Dossey said they favored police officers over regular witnesses, no police officer testified as to the facts of this case. That was left to the principals in this action. Eight officers testified during the course of this trial regarding the crime scene and evidence gathering. By our count, there were only eleven objections made during their testimonies and most were to the form of the questions. Never once was an officer's credibility called into question nor was any of it in conflict with Defendant's witnesses' testimonies.

In that regard, we note the case of *State v. Price*, 02-360 (La.App. 4 Cir. 4/2/03), 842 So.2d 491, *writs denied*, 03-1322 (La. 11/21/03), 860 So.2d 542 and 03-1517 (La. 12/12/03), 860 So.2d 1151, where the trial court denied the defendant's

31

challenge for cause regarding a prospective juror whose husband was a state trooper. During voir dire, the prospective juror indicated that she would probably find a police officer a more credible witness. She further indicated that it was possible that she could not hear the case without any bias in favor of believing the police witnesses. However, when questioned by the trial court, the prospective juror stated that she would give the testimony of all witnesses equal weight and would look at the testimony of each witness individually in order to determine whether their testimony was worthy of belief. The trial court subsequently denied the defendant's challenge for cause. In reviewing the case, our colleagues on the Fourth Circuit, Court of Appeal, noted that the trial court's questioning rehabilitated the prospective juror, and that none of the police officers that she knew testified at the trial. Additionally, her responses to the trial court's questioning showed that she could fairly evaluate the credibility of all witnesses and judge them equally. The appellate court then distinguished the case from *Hallal*, indicating that there was no confession or statement given to police by the defendant in *Price*. It also distinguished *Mathis*, where police seized cocaine directly from the defendant. Thus, the appellate court concluded that the state's burden of proof was not as directly dependent upon police credibility as it was in those two cases. The fourth circuit then held that the trial court did not abuse its discretion when denying the defendant's challenge for cause.

Likewise, in this case, the State's case was not dependent on the testimony of police officers, but on the testimony of the victim/eyewitness, Reyna. While in *Price*, the trial court did question the prospective juror and in the instant case the trial court did not conduct such examination, we are mindful of the broad

32

discretion afforded the trial court, particularly in light of the deference afforded the trial court in *Kang* and *Leger*.

In *Kang*, 859 So.2d at 653-654, the supreme court stated:

> In *State v. Lee*, 93-2810 (La.5/23/94), 637 So.2d 102, this court reiterated the broad discretion afforded trial courts' rulings on motions to strike jurors for cause because of their ability to get a first person impression of prospective jurors during voir dire. We characterized our jurisprudence as follows:
>
> > We have repeatedly held that a trial judge is vested with broad discretion in ruling on challenges for cause, and only where it appears, upon review of the voir dire examination as a whole, that the judge's exercise of that discretion has been arbitrary or unreasonable, resulting in prejudice to the accused, will this Court reverse the ruling of a trial judge[.]
>
> *Lee*, 93-2810 at p. 9, 637 So.2d at 108 (quoting *State v. Passman*, 345 So.2d 874, 880 (La.1977)).
>
> This standard is utilized since the trial court has the benefit of seeing the facial expressions and hearing the vocal intonations of the members of the jury venire as they respond to questioning. *Anthony*, 98-0406 at p. 25, 776 So.2d at 392. Such expressions and intonations are not readily apparent at the appellate level where a review is based on a cold record. *Lee*, 93-2810 at p. 9, 637 So.2d at 108.

In *Leger*, 936 So.2d at 169, the supreme court reiterated:

> Our review of the record fails to reveal disparate treatment on the part of the trial judge in his determination of the parties' cause challenges. Each of his rulings noted *supra* is supported by the record. In addition, we note the deference afforded to a trial court's first-hand observation of tone of voice, body language, facial expression, eye contact, or juror attention. This court previously held "significantly, it is in the determination of substantial impairment that the trial judge's broad discretion plays a critical role." *Lucky*, 1996-1687 p. 7, 755 So.2d at 850.

Accordingly, we find that the trial court did not abuse its broad discretion in denying Defendant's challenges for cause. In fact, it appears that Defendant did not take a peremptory challenge for Hudson until it came to the attention of the trial court

that she had made an inquiry of a bailiff/deputy sheriff concerning her safety and the safety of her family if the jury found Defendant guilty.

Having excused the venire, the trial court called Corporal Wilbert Weekly of the Rapides Parish Sheriff's Office for examination. Weekly stated that Hudson approached him and expressed concern regarding her safety, and asked who would protect her family if the jury found Defendant guilty. Defense counsel then re-urged a challenge for cause against Hudson; the trial court denied the challenge, and observed that Hudson's questions did not indicate she was assuming that she would find Defendant guilty. The trial court noted its belief that Hudson was still willing to consider the evidence. Also, the trial court noted Defendant's objection for the record. Our research has been fruitless in finding any cases on this issue and Defendant cites no cases in support of his objection. We again call to mind the jurisprudence that gives the trial court broad discretion in deciding challenges for cause, and we can find no error in the trial court's refusal to grant a cause challenge on this issue.

Finally, we note that the record shows that Defendant made no challenges for cause or even indicated that he wanted to excuse any other potential jurors after he used all of his peremptory challenges. Accordingly, we find that this assignment of error is without merit.

**OPENING STATEMENT/DEFENDANT'S INCULPATORY STATEMENT**

In his fourth assignment of error, Defendant claims the trial court erred by allowing the State to refer to his inculpatory statement in its opening argument. The State argues that Defendant suffered no prejudice, as he had advance notice that the State intended to introduce the statement, and that Defendant concedes this fact.

Before opening statements were given, the State indicated that it was going to mention Defendant's inculpatory statement in its opening statement. At that point, the trial court discussed with both Defendant and the State on the record the issue of whether or not the State could refer to Defendant's statement in its opening statement. Defendant conceded that the statement was provided to him during the investigation of his case and that he was not contesting the notice provision of the statement. The trial court then conducted a hearing regarding the admissibility of the statement and, following the taking of testimony on that issue, found it to be admissible. After further discussion with both parties, the trial court ruled that the State should not refer to the statement as a "confession" in its opening. The State did not object. Defendant then argued that the statement should not be referred to as an "admission" either, but the trial court overruled that motion and the opening statements proceeded wherein the State referred to the statement.

We note a similar scenario that arose before the Fifth Circuit Court of Appeal in *State v. Lisotta*, 97-407 (La.App. 5 Cir. 2/25/98), 712 So.2d 525. In that case, the prosecuting attorney said in his opening statement:

> "You're also going to hear from Deputy Kuhn that this defendant made several statements at the time that he was arrested denying certain things, saying things that the State intends to show, prove, that he's guilty, exactly what we say he's guilty of."

*Id.* at 527. Our colleagues in the fifth circuit wrote:

> Lisotta's trial counsel moved for a mistrial because any statements allegedly made by him had not yet been deemed admissible. LSA-C.Cr.P. art. 767 reads:
>
> > "The state shall not, in the opening statement, advert in any way to a confession or inculpatory statement made by the defendant unless the statement has been previously

35

ruled admissible in the case."

The record shows that prior to trial, the state had filed a notice of its intent to use and introduce Lisotta's statements into evidence. The purpose of Art. 767 is to prevent surprise and prejudice. In *State v. Strickland*, 683 So.2d 218 (La.1996), the Louisiana Supreme Court said that if the defense has prior notice of the state's intent to introduce a statement and the statement is properly admitted later, the prosecutor's premature mention of the statement in its opening statement to the jury causes no prejudice.

Here, the deputy's statement was admitted during the trial. *State v. Strickland, supra*, is controlling; consequently, this assignment of error is without merit.

*Id.*

*Lisotta* is on point in this case. Since Defendant has conceded that he had notice of the statement and knew that the State was likely to use it at trial, we find that this assignment of error has no merit.

### TRANSCRIPT OF DEFENDANT'S STATEMENT

In his fifth assignment of error, Defendant argues that the trial court erred by allowing the State to present the jury with a transcript of his statement to read as it listened to an audiotape of the statement. Defendant contends the transcript was not proven to be accurate, was, in fact, inaccurate, and was unnecessary since the audiotape's quality was not in question. While Defendant acknowledges the jurisprudence that allows juries to be provided transcripts while listening to taped statements, he claims that inaccuracies in the transcript distinguish the present case from the general case law.

We have said:

Furthermore, the supreme court has held that a "transcript of a tape [is] admissible over a best evidence objection, since the transcript provide[s] the jury with a convenience in following the playback of the

tape." *State v. Burdgess*, 434 So.2d 1062, 1066 (La.1983)(citing *State v. Snedecor*, 294 So.2d 207 (La.1974)). Thus, the trial court in the present case could have properly allowed the introduction of the transcripts into evidence. The Defendant cites no authority nor does the jurisprudence appear to support a finding that allowing the jury to read along while the tape was being played allowed the State to give the jury an "extra dose" of its version of the case. The jury was not able to view the transcripts during deliberations. Finally, since the defense counsel does not specifically allege any inconsistencies between the transcripts and the audio-tapes, we find defense counsel has failed to prove that the transcripts provided the jury with an erroneous interpretation of the tapes. Accordingly, this assignment lacks merit.

*State v. Sykes*, 03-397, pp. 31-32 (La.App. 3 Cir. 10/8/03), 857 So.2d 638, 658, *writ denied*, 03-3429 (La. 4/2/04), 869 So.2d 875 (alteration in original).

The trial court and the State also acknowledged that there were inaccuracies in the transcript, but the trial court ruled that the errors were not so significant that they required a limiting order.

We have reviewed the transcript and the tape, and agree with the trial court that any inaccuracies in the transcript are minor. As the State observed below, the transcriptionist (apparently a police department secretary) listed some passages as "inaudible," but the correlative passage on the tape were, in fact, audible. For example, when Defendant described a pistol to police, he told them it was a Ruger; however, the transcriptionist missed the term "Ruger" and typed "inaudible." At another point, the clause "I went back" is mis-transcribed as "I don't think."

The errors in the transcript do not alter the general nature of Defendant's statement, in which he denied any involvement in the shooting. Thus, Defendant has failed to show that use of the transcript prejudiced his case; this assignment of error lacks merit.

**OPENING STATEMENT**
**REFERENCE TO CO-DEFENDANT'S CONVICTION AND SENTENCE**

In this assignment of error, Defendant argues that the trial court erred by allowing the State to refer in its opening statement to Bell's (the co-defendant) conviction and sentence for second degree murder based on the incident at issue. Defendant did not object contemporaneously to those comments during the State's opening statement. Accordingly, the State argues that because Defendant failed to contemporaneously object, the issue was not preserved for appeal, pursuant to La.Code Crim.P. art. 841.

Defendant concedes that the remarks made by the State initially went unchallenged because he anticipated questioning Bell about whether he had made a deal with the State regarding his testimony, and he thought that discussing any such inducements would necessarily require him to discuss Bell's conviction. However, Defendant claims that since Bell denied on direct examination that he had made any deal regarding his testimony, Defendant claims he had no need to cross-examine him on this issue. Nonetheless, in his cross-examination of Bell, Defendant was able to suggest to the jury that some sort of deal had taken place.

Under cross-examination, Bell admitted that he had been convicted of second degree murder and attempted second degree murder. Bell said that he has yet to be sentenced on those charges and that he has filed a motion for a new trial on those convictions. He also admitted to pleading guilty to possession of marijuana with intent to distribute, for which he received a five year sentence with credit for time served and with that credit he had completed that sentence. Bell responded affirmatively when asked by Defendant whether the hearing on his motion for new

38

trial had been continued until after Defendant's trial. Defendant was able to lead Bell to say on cross-examination that if the motion for new trial on the second degree murder and attempted second degree murder convictions was granted, the charges would be "undone" and Bell would be "left with . . . attempted possession with intent." Further, Bell said that charges of first degree murder with the possibility of the death penalty and conspiracy to commit first degree murder had been dismissed by the State.

After completing his case-in-chief and just before resting his case, Defendant made a motion for mistrial based on the reference to Bell's conviction made by the State during its opening statement. Alternatively, he requested the trial court to instruct the jury "not to consider anything about Bell's trial." The trial court denied the motion, but subsequently instructed the jury that evidence of Bell's conviction was inadmissible against Defendant.

Defendant argues that his motion for mistrial preserved the issue for review, claiming that Article 841 does not require a contemporaneous objection, but merely an objection within a reasonable time. While we have found no case directly on point, we can rely on *State v. Phillips*, 03-304 (La.App. 4 Cir. 7/23/03), 853 So.2d 675, *writ denied*, 03-2406 (La. 2/6/04), 865 So.2d 738, for guidance. In *Phillips*, the defendant complained that the trial court had erred by denying his motion for a mistrial after the State made reference, during cross-examination, to a separate allegation that he had committed attempted murder. Defendant did not object, and briefly asked questions in an apparent attempt to clarify the situation the witness had mentioned. Later, after resting his case, the defendant moved for mistrial, which the trial court denied. Citing the contemporaneous objection rule codified in La.Code

39

Crim.P. art. 841, the *Phillips* court held that the defendant had failed to preserve the issue for review since he did not object at the time it arose.

In the present case, Defendant had not yet rested his case at the time when he moved for a mistrial. However, he was at the end of his case when he made his motion for a mistrial and he rested soon after the mistrial issue was discussed. In that regard, Phillips is factually similar to the case at hand. We rely on it and find that the trial court did not commit error in refusing to grant a mistrial because Defendant had not contemporaneously objected during the State's opening statement.

Further, it was due to Defendant's own trial strategy (a strategy that was apparently attempted) that the fact of Bell's conviction was put before the jury without objection. By the time Defendant moved for mistrial, it was already a matter of hindsight. He cannot now be heard to complain simply because the trial did not develop in accordance with his strategic expectations. Finally, while we agree with Defendant that Article 841 would allow for an objection to be made within a reasonable time from the alleged objectionable statement, the statute contemplates that an objection be made timely enough for the trial court to take corrective actions if such is possible. By the time Defendant made his objection and moved for mistrial, there was nothing the trial court could have done to correct the alleged error short of mistrying the case except by instructing the jury, which was done in this instance.

Accordingly, for the reasons discussed above, this assignment of error lacks merit.

### CO-DEFENDANT'S STATEMENT

Defendant argues in this assignment of error that the trial court erred in

refusing to admit into evidence a transcript of a statement made by the surviving victim, Reyna, to Detective Green. He argues that the transcript should have been admitted to prove the existence of the statement, which Reyna had denied giving during his testimony. Detective Green testified that he took several statements from Reyna and Reyna admits giving all of them except the one at issue, which was given on May 9th, the day Reyna got out of the hospital. The record is clear that Reyna denied giving the statement and Detective Green testified that the statement existed. Defendant urges that the trial court simply refused to admit the written statement into evidence as proof of the fact that the statement exists. The trial court stated:

> You have the right of showing them that exists. You clearly established that it existed with Detective Green. I mean, Detective Green clearly admitted there was a statement, and in front of the jury you identified the statement, you presented to 'm, he reviewed the statement. I'm going to, ah, deny its admission at this time.

"Absent a clear abuse of discretion, the trial judge's determinations concerning relevancy and admissibility should not be overturned." *State v. Cosey*, 97-2020, p. 13 (La. 11/28/00), 779 So.2d 675, 684, *cert. denied*, 533 U.S. 907, 121 S.Ct. 2252 (2001) (citations omitted). Because the existence of the statement was established through Green's testimony, and its existence was effectively demonstrated before the jury, we are unable to say that the trial court abused its discretion in denying the admission of the transcript. Therefore, this assignment of error also lacks merit.

## ERRORS PATENT

We review all appeals in accordance with La.Code Crim.P. art. 920, for errors patent on the face of the record. After reviewing the record, we find that there are two possible errors patent.

41

First, the bill of information erroneously cites La.R.S. 40:966(A)(1)(G) for count four, possession with the intent to distribute marijuana. The correct citation for that offense is La.R.S. 40:966(A)(1). Subsection G provides for a special restriction on probation and parole for those persons to whom subsections (D) and (F) apply. Since subsections (D) and (F) are not applicable in this case to Defendant, subsection (G) is likewise inapplicable. Additionally, we note that in one portion of the bill of information, La.R.S. 14:30 is erroneously cited as the statute for attempted second degree murder, count two. In another portion of the bill, however, La.R.S. 14:30.1 is correctly cited for that count. The erroneous citation of a statute in the charging instrument is harmless error as long as the error did not mislead the defendant to his prejudice. La.Code Crim.P. art. 464. After reviewing the face of the record, we find that there was no prejudice to Defendant nor does he allege any because of the erroneous citations mentioned above. Thus, the citation errors are harmless.

Second, the trial court erroneously ordered the first five years of the sentence imposed for count four, possession with the intent to distribute marijuana, to be served without benefit of parole. At the time Defendant committed the present offense, April 23, 2003, the penalty provision for possession with the intent to distribute marijuana provided for a sentence of five to thirty years at hard labor and a fine of not more than $50,000.00. La.R.S. 40:966(B)(3). The penalty provision does not authorize the trial court to impose any of the sentence without benefit of parole. Thus, the trial court improperly denied parole eligibility. Accordingly, we amend Defendant's sentence on that count to delete the denial of parole eligibility for the first

42

five years.  *See State v. Gregrich*, 99-178 (La.App. 3 Cir. 10/13/99), 745 So.2d 694 and *State v. Buckley,* 02-1288 (La.App. 3 Cir. 3/5/03), 839 So.2d 1193.  *See also State v. Sanders*, 04-17 (La. 5/14/04), 876 So.2d 42, where the supreme court found that an appellate court should not rely on the self-activating provisions of La.R.S. 15:301.1 when the trial court imposes "limits beyond what the legislature has authorized in the sentencing statute(s)." *Id.* at 42.  We also instruct the trial court to make an entry in the minutes reflecting this change.  *See State v. Tate*, 99-1483 (La. 11/24/99), 747 So.2d 519.

## CONCLUSION

Defendant's convictions for second degree murder, attempted second degree murder, possession of a firearm by a convicted felon, and possession of marijuana with intent to distribute are affirmed.  However, we amend the sentence on possession of marijuana with intent to distribute conviction to delete the denial of parole eligibility for the first five years, and instruct the trial court to amend the minutes to reflect that change.

**AFFIRMED WITH INSTRUCTIONS**.