NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT
KA 10-474


STATE OF LOUISIANA

VERSUS

EDWARD D. GRESHAM

**********
APPEAL FROM THE
THIRTY-FIFTH JUDICIAL DISTRICT COURT
PARISH OF GRANT, NO. 08-625
HONORABLE WARREN DANIEL WILLETT, DISTRICT JUDGE


**********
BILLY HOWARD EZELL
JUDGE

**********


Court composed of Marc T. Amy, Billy Howard Ezell, and David E. Chatelain,* Judges.




AFFIRMED; REMANDED WITH INSTRUCTIONS.

George Lewis Higgins, III
Attorney at Law
P. O. Box 3370
Pineville, LA 71361-3370
(318) 473-4250
Counsel for Defendant/Appellant:
Edward D. Gresham

---

* Honorable David E. Chatelain participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.

**James Patrick Lemoine**
**District Attorney, Thirty-Fifth Judicial District Court**
**Renee W. Dugas**
**Assistant District Attorney, Thirty-fifth Judicial District Court**
**P. O. Box 309**
**Colfax, LA 71417-0309**
**(318) 627-3205**
**Counsel for Appellee:**
**State of Louisiana**

**EZELL, JUDGE.**

The Defendant, Edward D. Gresham, was charged by bill of information filed on September 31, 2008, with false imprisonment with a dangerous weapon in violation of La.R.S. 14:46.1. The Defendant entered a plea of not guilty on October 10, 2008. Trial by jury commenced on November 18, 2009, and the Defendant was subsequently found guilty as charged. On November 19, 2009, he was sentenced to serve seven and one-half years at hard labor. The Defendant filed a motion for appeal on November 30, 2009, which was subsequently granted. A motion to reconsider sentence was filed on December 30, 2009, and denied as untimely on March 11, 2010.

The Defendant is now before this court asserting two assignments of error. Therein, the Defendant contends the evidence is insufficient to support his conviction and his sentence is excessive.

## FACTS

The Defendant forced his wife, Carolyn Gresham, to watch a videotape in their bedroom with the door locked while he pointed a gun at her.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find there are two errors patent.

There is an error in the bill of information. The bill of information provides that the Defendant, on or about August 11, 2008, committed the crime of false imprisonment with a dangerous weapon "by the intentional confinement or detention of the victim, without consent and proper legal authority while offender is armed with a dangerous weapon."

1

The short-form indictment for a charge of false imprisonment is "A.B. falsely imprisoned C.D." La.Code Crim.P. art. 465(A)(25).

Louisiana Code of Criminal Procedure Article 473 provides, in pertinent part:

> When the name of the person injured is substantial and not merely descriptive, such as when the injury is to the person, as in murder, rape, or battery, the indictment shall state the true name of the victim or the name, appellation, or nickname by which he is known. If the name, appellation, or nickname of the victim is not known, it is sufficient to so state and to describe him as far as possible.

The comments to Article 473 explain that this article was based "upon Art. 230 of the 1928 Louisiana Code of Criminal Procedure, which follows the sound rule that an allegation of the name of the injured party is essential in an indictment for crimes against the person."

In *State v. Varnado*, 22 So.2d 587 (La.1945), the defendants, convicted of conspiracy to commit false imprisonment, complained the trial court erred in failing to grant certain pretrial motions, including a motion to quash the bill of information. The court concluded the defendants were entitled to relief as the bill failed to set forth the name of the victim. The court explained, in pertinent part:

> Article 230 of the Code of Criminal Procedure as adopted in 1928 provided: "When the name of the person injured is substantial, and not merely descriptive, that is to say, when the injury is to the person, as in murder, rape or wounding, the indictment shall state the name of such person, or if unknown, that it is unknown, and if unknown, the indictment shall make it appear, by sufficient allegation, who was the party injured."

> By Act 147 of 1942 the article was amended to the extent of substituting the word "battery" for the word "wounding".

> Clearly, in view of the similarity of the language used, Article 230 of the Code of Criminal Procedure has as its basis the following statement found in Section 321 of Marr's Criminal Jurisprudence of Louisiana (2d Ed.--1923): "When the name of the person injured is substantial, that is to say, when the injury is to the person, as in murder, rape or wounding, and is not merely descriptive, the failure to allege the name, or, if unknown, that it is unknown, or failure to make it appear by

2

sufficient allegation who was murdered, ravished or shot, is not a mere formal defect, and is good in arrest of judgment (a); * * *."

The "(a)" of the quoted statement directs attention to a footnote wherein the author comments: "* * * Though none of our adjudged cases says so, the several sorts of assault, malicious prosecution, *false imprisonment*, libel and slander, of course, come under this rule." (Italics ours.)

We agree with the comment that the crime of false imprisonment (and necessarily that of conspiring to commit false imprisonment) is governed by the mandatory provisions of the announced rule, now a definite article in our Code of Criminal Procedure. Unquestionably a crime of that kind is an injury to the person; certainly it is not an injury to property. It is true that after the phrase "when the injury is to the person", the article states "as in murder, rape or battery"; but obviously these offenses are mentioned merely for illustrative purposes. Moreover, the name of the person injured in the crime of false imprisonment, or in that of conspiring to commit false imprisonment, is substantial; it is not merely descriptive as might be the case in certain offenses in which damage to property is charged.

*Id.* at 588-89.

However, unlike in *Varnado,* the Defendant did not file a motion to quash and did not object to the bill on that basis that the bill failed to set forth the name of the victim. *See* La.Code Crim.P. art. 532. Moreover, a review of the face of the record shows no indication that this error misled the Defendant to his prejudice, and neither the minutes nor the pleadings indicate the Defendant alleged any prejudice prior to trial. Accordingly, we find this error harmless. *Cf. State v. Poche*, 05-1042 (La.App. 3 Cir. 3/1/06), 924 So.2d 1225, and *State v. Roberts*, 06-765 (La.App. 3 Cir. 1/17/07), 947 So.2d 208, *writ denied*, 07-362 (La. 10/5/07), 964 So.2d 938.

Additionally, we find the trial court failed to properly advise the Defendant of the prescriptive period for filing post-conviction relief. *See* La.Code Crim.P. art. 930.8. The transcript of sentencing indicates the trial court, referring to post-conviction relief, informed the Defendant that "you have a period of two years to seek any post-conviction relief that you may wish to seek." Louisiana Code of Criminal

3

Procedure Article 930.8 provides the defendant has two years after the conviction and sentence become final to seek post-conviction relief. This court finds the advisement was insufficient and directs the trial court to inform the Defendant of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to the Defendant within ten days of the rendition of this opinion and to file written proof in the record that the Defendant received the notice. *See* *State v. Roe*, 05-116 (La.App. 3 Cir. 6/1/05), 903 So.2d 1265, *writ denied*, 05-1762 (La. 2/10/06), 924 So.2d 163.

## ASSIGNMENT OF ERROR NUMBER ONE

In his first assignment of error, the Defendant contends the trial court erred in concluding the State presented sufficient evidence beyond a reasonable doubt that he imprisoned his wife against her will.

> It is well settled that the standard of review in a sufficiency of the evidence claim is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged." *State v. Leger*, 05-11, p. 91 (La.7/10/06), 936 So.2d 108, 170, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Captville*, 448 So.2d 676, 678 (La.1984)). In fact, this standard of review is now legislatively embodied in La.Code Crim.P. art. 821. It does not allow the appellate court "to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford*, 05-477, p. 6 (La.2/22/06), 922 So.2d 517, 521; *State v. Robertson*, 96-1048 (La.10/4/96), 680 So.2d 1165. That is to say, the appellate court's function is not to assess the credibility of witnesses or reweigh the evidence. *State v. Smith*, 94-3116 (La.10/16/95), 661 So.2d 442. The factfinder's role is to weigh the credibility of witnesses. *State v. Lambert*, 97-64 (La.App. 3 Cir. 9/30/98), 720 So.2d 724. Other than insuring the sufficiency evaluation standard of *Jackson*, "the appellate court should not second-guess the credibility determination of the trier of fact," but rather, it should defer to the rational credibility and evidentiary determinations of the jury. *Id*. at 727; *State v. Turner*, 04-1250 (La.App. 3 Cir. 3/2/05), 896 So.2d 286, *writ denied*, 05-871 (La.12/12/05), 917 So.2d 1084. Indeed, a witness's credibility is "a matter of the weight of the evidence, not subject to appellate review." *State v. Strother*, 09-110, p. 15 (La.App. 3 Cir. 10/7/09), 19 So.3d 598, 607-08.

*State v. R.R.*, 09-1410, p. 6 (La.App. 3 Cir. 5/5/10), 37 So.3d 501, 505-06.

4

In order to support a conviction for false imprisonment while armed with a dangerous weapon, the State had to prove the Defendant unlawfully and intentionally confined or detained the victim while armed with a dangerous weapon. La.R.S. 14:46.1.

Detective James Watkins testified that he responded to a call at the Defendant's residence. He was told by dispatch that a man was holding his wife at gunpoint and would not let her leave the residence. Detective Watkins testified that dispatch had made contact with the Defendant and requested that he go onto the porch without the weapon when police arrived. The Defendant complied with the request, and he was detained.

Detective Watkins spoke to the Defendant's wife, Carolyn, and then with the Defendant. Detective Watkins testified that the Defendant told police he had a friend drop him off in the woods and he was watching his house to see if Carolyn was cheating on him. Detective Watkins testified that another shift had received a phone call from the Defendant indicating he saw three or four subjects come out of his house and stand on the corner smoking cigarettes. He called 911 in fear for his family. Deputies responded but found nothing.

The Defendant advised Detective Watkins that he was upset and had made Carolyn watch a videotape and listen to audio. The Defendant further stated that he possessed a shotgun but was not going to hurt her. Detective Watkins testified that he believed the Defendant pointed the shotgun at Carolyn's head and threatened to kill her. The gun was found in the gun cabinet in the Defendant's bedroom. Detective Watkins did not remember if the gun was loaded when it was found.

Detective Watkins testified that he watched the videotape and listened to "some audio." After the video was viewed, the Defendant admitted that he had a shotgun.

5

He further indicated he was mad because Carolyn was having an affair. The Defendant said he had audio and video of Carolyn "having multiple partners" in the residence while his children were there. Detective Watkins testified there was no proof of such on the video.

Detective Jody Bullock testified that the day following the incident, Carolyn told him the Defendant threatened to blow her head off with a shotgun if she did not watch a videotape. Additionally, he refused to let her leave the bedroom they were in or the house until she watched the videotape. After watching the video, the Defendant refused to let Carolyn leave and told her to take a shower and clean herself up. While in the bathroom, the victim called 911. The Defendant called Detective Bullock and asked that the videotape be returned to him. Detective Bullock testified that the only thing he saw on the video was a white man, whom he thought was the Defendant, walk across the screen. Additionally, Detective Bullock pointed out to the Defendant that he had accused Carolyn of having affairs with black men, but the man on the video was obviously white. Although the Defendant stated that he could hear his daughter crying on the audio tape and thought she was being raped, Detective Bullock never heard anything on the recordings.

Detective Bullock interviewed the Defendant who admitted he was at his residence on the night in question to spy on his wife, as he thought she was having an affair. On the night in question, the Defendant called police regarding prowlers. When police arrived, the Defendant met them and reported that he felt someone was trying to steal his gas. Police woke Carolyn, who did not know her husband was at the residence. The Defendant later stated he called police because men were going in and out of the residence. He stated the men left before police arrived.

The Defendant told Detective Bullock that he had to make Carolyn watch the videotape. The Defendant admitted he got the shotgun out and made Carolyn watch the video. He said he used the gun to scare her. He locked the bedroom door because he did not want the kids to walk in and see their mother having sex with men on the video. Detective Bullock did not believe the gun was used for the safety of the children.

Carolyn testified that on August 11, 2008, she was asleep in the recliner and her son Will, was on the couch. Carolyn thought the Defendant was at his brother's home in West Monroe. At approximately midnight, a sheriff's deputy knocked on the door of Carolyn's home. She was informed that police had received an anonymous call regarding a prowler. Carolyn informed police there had been no one at her home all evening. She stepped onto the porch and saw the Defendant walking from the back of the shed.

Carolyn explained to police the Defendant had been accusing her of having affairs. He used crystal meth, had been putting hidden cameras in the house and car, and had hidden tape recorders in the house and car. The Defendant subsequently entered the home. Carolyn then put Will to bed and fell asleep with him. Before Carolyn fell asleep, the Defendant removed a television from Will's room and brought it into his bedroom. After Carolyn fell asleep, the Defendant woke her and said he wanted to show her something. Carolyn willingly went into the bedroom with the Defendant. The Defendant then closed the bedroom door, locked it, and told Carolyn about a videotape he wanted her to watch of her having sex with someone other than him. The Defendant then picked up a shotgun. The Defendant pointed the gun at her and told her he was going to kill her. Carolyn testified that she did not feel she could leave the room and did not do so because she thought the Defendant would

7

kill her. However, she did not ask to leave. Carolyn had no idea if the gun was loaded, but she assumed it was because the Defendant said he was going to kill her. The Defendant's finger was on the trigger of the gun during this time.

Carolyn testified that she and the Defendant left the bedroom at one point. The Defendant marched her at gunpoint from the bedroom to the living room to retrieve surveillance equipment. The two returned to the bedroom and the Defendant locked the door. Carolyn testified that she felt the need to escape but never tried to unlock the door.

Carolyn also testified that she did go to the bathroom, which was accessed by walking through the bedroom closet, several times during the course of events. During those times, the Defendant was on the computer trying to bring up audio from recordings he had made during the five preceding years. She thought about calling for help, as there was a phone in the bathroom, but thought the Defendant would hear. Carolyn further testified that the Defendant would go in and out of the bathroom while she was in there. Once he entered the bathroom, pointed the gun at her, and told her to get undressed and shower. At that time, Carolyn turned on the shower and called 911. Carolyn got out of the shower, locked the bathroom door, and hid in the closet. The Defendant eventually realized police were in route, and he spoke to the 911 operator. The Defendant then agreed to go outside and wait for the police.

The Defendant testified that he had a gun but did not put it to Carolyn's head and did not aim it at her. The Defendant further testified that he needed a gun because "[t]hey" intended to kill him. By "[t]hey," the Defendant meant a small group of swingers Carolyn worked with.

The Defendant also testified that the Thursday prior to the date of the offense, he was working out of town. He testified that his son was terrified and begged him

8

not to leave. That Thursday, the Defendant set up surveillance equipment. On a tape, he heard comments regarding someone killing him. The Defendant testified that Carolyn and a man named Bobby Dunn threatened to kill him. The Defendant further testified that Bobby and Kevin were at the Defendant's house that Thursday along with Cookie and Nikki.[1] The Defendant indicated that State police had the tape which contained these remarks.

The Defendant further testified that his intent on the night of the offense was to hide out and watch people go to the house. He approached the house and startled someone who was sitting on the porch. The person entered the house, and all the lights then came on. The back door subsequently opened, and two people came out. One of them made a phone call. Cookie then walked off the front porch and down the driveway. The Defendant testified that he made a noise like "bang-bang." Subsequently, lights were shining from the driveway toward the house and then "they" left. The Defendant then dialed 911. He told the police someone was trying to steal the gas tank from his boat. The police arrived and spoke to Carolyn, who told them no one had been inside the house, and the police left.

The Defendant testified that he went into the house as soon as police left. The Defendant got a flashlight, got his gun from the boat located under the carport, and went to the dog pen. He returned to the house twenty to twenty-five minutes later.

When the Defendant got back to the house, Carolyn was in bed with Will. The Defendant testified that Carolyn would not let him in Will's room. The Defendant then went to his own bedroom. He then unloaded the gun and put it in the gun cabinet. He took the digital recorder from under the night stand and listened to it.

The Defendant subsequently viewed a videotape, which contained nothing of

---

[1]The Defendant did not give any other details about these people.

9

importance. He then went and asked Carolyn to come into the bedroom. Once Carolyn entered the room, the Defendant locked the door. The gun was in the cabinet at that time. The Defendant testified that he always locked the door when the two went into the bedroom. Further, Carolyn never expressed a desire to leave the room. She went to the bathroom several times and fidgeted with the window blinds. The Defendant testified that he told her not to touch the blinds, as he did not want anyone looking into the house. He also fussed at her for turning off the flood lights a couple of times. The Defendant testified that the only threat he made was to tell Carolyn that if she did anything to harm him or if anyone tried to shoot through the window or come through the door, he would do whatever it took to defend himself.

He told Carolyn to take a shower because she was filthy. When asked why she was filthy, the Defendant responded: "Well to me, the thought of a bisexual orgy is filthy."

The Defendant testified that he and Carolyn watched the video for one to one- and one-half hours. He went to get video equipment, and Carolyn went with him. The Defendant was then questioned as follows:

Q      Do you have the gun at that point?

A      I did not have the gun.

Q      Again, what was the purpose of the gun?

A      The purpose of the gun was for my own protection.

Q      From the people that you had seen - -

A      Right.

Q      - - earlier that night?

A      (NO VERBAL RESPONSE HEARD)

10

The Defendant further testified that he did not tell Detective Bullock that he thought one of the tapes contained audio of one of his children being raped. The Defendant said he told Detective Bullock that he thought he heard a child crying and someone talking about getting in bed with his daughter. He denied telling Detective Bullock that he forced Carolyn to watch the videotape.

Will Gresham, the ten-year-old son of Carolyn and the Defendant, testified that he thought he saw a man in his closet with a gun a few months before the "break-up." His mother had looked in the closet and said she did not see anything. Will further testified that he thought police went to his house that night but he did not really remember. The Defendant was away on a business trip at that time. This occurred after the man with the telegram came.

Will testified that "[a]round that time," a man came to the door and said he had a telegram for Carolyn. His mother told the man to come in, and Will watched television. The man went into the bedroom, and Will fell asleep on the couch. When Will woke up, Carolyn told him to "get in my bed with them." Police were not there that night.

In brief to this court, the Defendant asserts that Carolyn never alleged she was forbidden to leave the home. Further, she testified that she did not think she could leave the room because she was afraid the Defendant would kill her. However, the Defendant disputed this testimony and there were no other witnesses to support Carolyn's testimony. The Defendant further asserts that even if Carolyn was taken at her word, threats do not prove he prohibited her from leaving the room or the home. In fact, the record demonstrates that Carolyn left the room several times and had access to a telephone. The Defendant asserts this is a tragic domestic dispute, not a case of false imprisonment, because there was no true indication that he forced

11

Carolyn to stay and watch the video. The Defendant further contends that he offered a plausible reason for arming himself—the fear of intruders outside, which was substantiated by his son.

In *State v. Taves*, 02-709, pp. 8-9 (La.App. 3 Cir. 1/15/03), 846 So.2d 1, 7, *affirmed in part, reversed in part,* 03-518 (La. 12/3/03), 861 So.2d 144, this court stated the following:

> In *State v. Guillory*, 461 So.2d 492 (La.App. 3 Cir.1984), the defendant appealed challenging the sufficiency of the evidence on his convictions of theft and false imprisonment while armed with a dangerous weapon. Deputy John Patrick Arceneaux, an undercover narcotics agent for the Calcasieu Parish Sheriff's Office, arrived at the defendant's home to attempt to purchase drugs. The defendant and Gerald Comeaux accused the deputy of being an undercover narcotics agent which the deputy denied. When the defendant left the room briefly, the deputy ran out of the house and Mr. Comeaux tackled the deputy in the front yard. The defendant came out of the house, removed the deputy's gun and all three men entered the house. The deputy testified the defendant forced him inside at gunpoint. Shortly thereafter, others arrived at the defendant's home and began to beat him. The defendant stopped the beating and allowed the deputy to leave, but kept the gun. This court found:

>> Accepting the facts in the light most favorable to the prosecution, the jury would find this defendant guilty of theft and false imprisonment, offender armed with a dangerous weapon, beyond a reasonable doubt. The conviction is based on the direct testimony of Deputy Arceneaux, and other evidence. Other witnesses contradicted Arceneaux. However, when there is conflicting testimony as to a factual matter such as this, the question of the credibility of the witnesses is within the sound discretion of the trier of fact. His factual determinations are entitled to great weight and will not be disturbed unless clearly contrary to the evidence. *State v. Klar*, 400 So.2d 610 (La.1981). The jury's decision to believe Deputy Arceneaux was not clearly contrary to the evidence.

> In the present case, the State asserted the false imprisonment occurred between February 7 and February 28. Ms. Daigle testified the day the defendant informed her of the incident at her mother's home (which, according to the State, was February 7, 2000), he pulled a gun on her, threatened to kill her, denied her access to a phone and refused to allow her to leave. Although Ms. Daigle's testimony regarding other

12

occurrences during February 2000 were contradicted and/or inconsistent at times with that of other witnesses, Ms. Daigle's testimony regarding the February 7 incident was neither disputed nor contradicted. Viewing the evidence in the light most favorable to the prosecution, we conclude the State presented sufficient evidence to convict the defendant of false imprisonment while armed with a dangerous weapon.

Although Carolyn voluntarily entered the bedroom with the Defendant, she testified that the Defendant pointed a gun at her and said he was going to kill her. Thus, she did not feel she could leave the room. Additionally, the bedroom door was locked.

Detective Watkins testified that the Defendant stated he made Carolyn watch a videotape. Additionally, the Defendant possessed a shotgun but was not going to hurt Carolyn. Detective Watkins further testified that he believed the Defendant pointed the shotgun at Carolyn and threatened to kill her. Detective Bullock testified that the Defendant stated he got a gun and made Carolyn watch the videotape. Additionally, the Defendant locked the bedroom door. Detective Bullock further testified that Carolyn told him the Defendant threatened to blow her head off if she did not watch the videotape and the Defendant refused to let her leave the bedroom until she watched the video.

We find this testimony and the cases cited herein support the Defendant's conviction of false imprisonment with a dangerous weapon, as Carolyn was not allowed to leave the bedroom when the Defendant was armed with a shotgun, forcing her to watch a video tape. Further, the jury's verdict indicates it chose to believe Carolyn's testimony and not that of the Defendant. This court should not second-guess that credibility determination. For the reasons asserted herein, this assignment of error lacks merit.

**ASSIGNMENT OF ERROR NUMBER TWO**

13

In his second assignment of error, the Defendant contends the trial court erred by imposing an excessive sentence.

The Defendant was sentenced on November 19, 2009. A motion to reconsider sentence was filed on December 30, 2009, and denied as untimely on March 11, 2010. Pursuant to La.Code Crim.P. art. 881.1, the Defendant had thirty days to seek review of his sentence, unless such time was extended by the trial court. The motion to reconsider was filed more than thirty days after sentencing and the record does not reflect the trial court gave any additional time to file the motion.

In *State v. Bamburg*, 00-675 (La.App. 3 Cir. 11/2/00), 772 So.2d 356, the defendant failed to object to the sentence imposed at the sentencing hearing and did not timely file a motion to reconsider sentence. Thus, this court found his claim of excessiveness of sentence was barred. *See also State v. Williams*, 01-998 (La.App. 3 Cir. 2/6/02), 815 So.2d 908, *writ denied*, 02-578 (La. 1/31/03), 836 So.2d 59. We find the Defendant waived his right to seek review of his sentence, as his motion to reconsider was untimely filed.

### CONCLUSION

The Defendant's conviction and sentence are affirmed. We remand the matter to the trial court with instructions to inform the Defendant of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to the Defendant within ten days of the rendition of this opinion and to file written proof that the Defendant received the notice in the record of the proceedings.

**AFFIRMED**; **REMANDED WITH INSTRUCTIONS**.

This opinion is NOT DESIGNATED FOR PUBLICATION. Uniform Rules-Courts of Appeal. Rule 2-16.3.

14