# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 17-1166

STATE OF LOUISIANA

VERSUS

KEVIN  JAMES ALEXANDER

-AKA- KEVIN J. ALEXANDER

-AKA- JAMES K. ALEXANDER

-AKA- KEVIN ALEXANDER, JR.

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. CR 145966
HONORABLE DAVID MICHAEL SMITH, DISTRICT JUDGE

**********

## D. KENT SAVOIE
## JUDGE

**********

Court composed of Billy Howard Ezell, Shannon J. Gremillion, and D. Kent Savoie, Judges.

**CONVICTIONS AFFIRMED; SENTENCES AFFIRMED IN PART AND VACATED IN PART; CASE REMANDED FOR RESENTENCING WITH INSTRUCTIONS.**

**Annette Fuller Roach**
**Louisiana Appellate Project**
**Post Office Box 1747**
**Lake Charles, Louisiana 70602-1747**
**(337) 436-2900**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Kevin James Alexander**

**Honorable Keith A. Stutes**
**Lafayette Parish District Attorney**
**Post Office Box 3306**
**Lafayette, Louisiana 70502-3306**
**(337) 232-5170**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**Michele S. Billeaud**
**Attorney at Law**
**1007 St. John Street**
**Lafayette, Louisiana 70501**
**(337) 266-2055**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**SAVOIE, Judge.**

Defendant, Kevin James Alexander a/k/a Kevin J. Alexander a/k/a James K. Alexander a/k/a Kevin Alexander, Jr., was found guilty, after a trial by jury, of one count of aggravated flight from an officer, a violation of La.R.S. 14:108.1(C), and one count of aggravated criminal damage to property, a violation of La.R.S. 14:55. Defendant now appeals his convictions. For the following reasons, we affirm Defendant's convictions.

**FACTS AND PROCEDURAL HISTORY**

On April 22, 2014, the Defendant fired several shots into a home occupied by thirteen people, which included his four children. He later led police on a high-speed chase originating in Lafayette and ending in Calcasieu Parish.

Defendant was charged by bill of information filed on June 12, 2014, with thirteen counts of attempted first degree murder, violations of La.R.S. 14:27 and La.R.S. 14:30, and one count of aggravated flight from an officer, a violation of La.R.S. 14:108.1(C). The State amended the bill of information on April 19, 2017, to add the charge of aggravated criminal damage to property, a violation of La.R.S. 14:55.

On May 9, 2017, the State severed all thirteen counts of attempted first degree murder and proceeded to trial by jury on the charges of aggravated flight from an officer and aggravated criminal damage to property. The jury found Defendant guilty of both counts on May 12, 2017. On July 19, 2017, all thirteen counts of attempted first degree murder were dismissed by the State.

Sentencing was held on August 28, 2017. At that time, Defendant was ordered to serve twelve years at hard labor for aggravated criminal damage to

property.  His sentence for aggravated flight from an officer is unclear.  The trial court ordered the sentences to be served concurrently.

A motion for appeal was filed on September 5, 2017, and subsequently granted by the trial court.  On September 6, 2017, Defendant filed a pro se motion for appeal, and that motion was also granted.  Defendant is now before this court asserting two assignments of error:  1) the evidence is insufficient to prove beyond a reasonable doubt all of the elements of the charged offenses; and 2) the trial court erred in denying the motion for mistrial made on behalf of the Defendant following the State's opening statement.  For the following reasons, Defendant's convictions are affirmed.

## LAW AND DISCUSSION

### I. Errors Patent

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record.  After reviewing the record, we find two errors patent present.

First, Defendant received an indeterminate sentence for aggravated flight from an officer, a violation of La.R.S. 14:108.1.  Louisiana Revised Statutes 14:108.1 provides that a defendant shall be imprisoned at hard labor for not more than two years and may be fined not more than two thousand dollars.  Defendant's second conviction was for aggravated criminal damage to property, a violation of La.R.S. 14:55.  That statute provides that a defendant shall be fined not more than ten thousand dollars, imprisoned with or without hard labor for not less than one nor more than fifteen years, or both.

When imposing Defendant's sentences, the judge stated:

THE COURT: Twelve years at hard labor for aggravated flight from an officer, and you shall be imprisoned at hard labor for not more than two years and may be fined not more than $2,000. With that, he will do a maximum of two years under 1455[sic]. For aggravated criminal damage to property he shall be fined not more than $10,000 and imprisoned with or without hard labor for not less than one nor more than fifteen years or both for that crime.

. . . .

THE COURT: And it shall be twelve years at hard labor, both of which shall run concurrent.

It appears that the court imposed a twelve-year hard labor sentence for aggravated criminal damage to property after stating the penalty range for that offense as provided in La.R.S. 14:55. However, Defendant's sentence for aggravated flight from an officer is unclear. Louisiana Code of Criminal Procedure Article 879 requires the imposition of a determinate sentence. Accordingly, the sentence for aggravated flight from an officer is vacated, and the case is remanded for resentencing on that conviction.

Next, the record before this court does not indicate that the trial court advised Defendant of the prescriptive period for filing post-conviction relief as required by La.Code Crim.P. art. 930.8. Thus, the trial court is directed to inform Defendant of the provisions of Article 930.8 at resentencing.

II. *Assignment of Error Number One*

In his first assignment of error, Defendant contends the evidence admitted at trial was insufficient to prove beyond a reasonable doubt all of the elements of the charged offenses. Defendant argues that the State failed to prove his identity as the shooter who committed aggravated criminal damage to property and the elements of aggravated flight from an officer.

When reviewing the sufficiency of the evidence to support a conviction, Louisiana appellate courts are controlled by the standard

3

enunciated by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). *See State v. Captville*, 448 So.2d 676, 678 (La.1984). That standard dictates that to affirm the conviction the appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that the State proved all elements of the crime beyond a reasonable doubt. *State v. Johnson*, 03-1228, p. 4 (La.4/14/04), 870 So.2d 995, 998; *Captville*, 448 So.2d at 678. Further, when the conviction is based on circumstantial evidence, La. R.S. 15:438 sets forth the rule that "assuming every fact to be proved that the evidence tends to prove, in order to convict, [the circumstantial evidence] must exclude every reasonable hypothesis of innocence." However, La. R.S. 15:438 does not establish a stricter standard of review than the more general rational juror's reasonable doubt formula; rather it serves as a helpful evidentiary guide for jurors when evaluating circumstantial evidence. *State v. Toups*, 01-1875, p. 3 (La.10/15/02), 833 So.2d 910, 912; *State v. Chism*, 436 So.2d 464, 470 (La.1983). When evaluating circumstantial evidence, the trier of fact must consider

> the circumstantial evidence in light of the direct evidence, and vice versa, [and] the trier of fact must decide what reasonable inferences may be drawn from the circumstantial evidence, the manner in which competing inferences should be resolved, reconciled or compromised; and the weight and effect to be given to each permissible inference. From facts found from direct evidence and inferred from circumstantial evidence, the trier of fact should proceed, keeping in mind the relative strength and weakness of each inference and finding, to decide the ultimate question of whether this body of preliminary facts excludes every reasonable hypothesis of innocence.
> *Chism*, 436 So.2d at 469.

Finally, constitutional law does not require the reviewing court to determine whether it believes the witnesses or whether it believes that the evidence establishes guilt beyond a reasonable doubt. *State v. Mussall*, 523 So.2d 1305, 1309 (La.1988). Rather, the fact finder is given much discretion in determinations of credibility and evidence, and the reviewing court will only impinge on this discretion to the extent necessary to guarantee the fundamental protection of due process of law. *Johnson* at pp. 4-5, 870 So.2d at 998; *Toups* at p. 3, 833 So.2d at 912.

*State v. Major*, 03-3522, pp. 5-7 (La. 12/1/04), 888 So.2d 798, 801-02 (alterations in original).

Corporal Britney Ardoin testified that, as the result of two 911 calls placed on April 22, 2014, she was dispatched to the 100 block of Newport Street. The calls were received from a cell phone that was pinging off a cell tower in that general area. The male caller identified himself as Kevin Alexander. The man was crying and said he was tired and somebody was going to die. Corporal Ardoin testified that Defendant also said, "'What if I kill some kids, then y'all are gonna [sic] hear me, and I will show you how dangerous I can be.' 'Y'all will be too late, because y'all are always late.' 'Shots fired, multiple people down.'" As a result of the calls, police canvased the area.

Approximately an hour after the 911 calls, Corporal Ardoin was dispatched to 515 Orchid Drive in relation to shots being fired. That call also concerned Kevin Alexander. The cell tower used to make the previous two 911 calls was less than one mile from the Orchid Drive residence.

Once at the residence, Corporal Ardoin saw bullet holes on the exterior of the home near two bedrooms. Corporal Ardoin believed six rounds were found in the master bedroom, where Robert and Margaret Bob had been sleeping. Four bullets entered a second bedroom. Four people had been sleeping therein, including three of Defendant's children.

The shooter was not present when police arrived, and police found nothing on the ground outside the home that indicated who the perpetrator was. Additionally, there was no video surveillance. As a result of information provided by the victims, police later went to an address in the 2200 block of Moss Street.

Corporal Ardoin was questioned about the bedroom shown in State's Exhibit 4, which depicted what looked like a blanket of some sort on the window of the second bedroom. When asked whether it looked "like it's kind of taped or tied

5

down, maybe," Corporal Ardoin responded, "Yes." She then indicated that there may have been a sheet over the window. Corporal Ardoin indicated the master bedroom also had a sheet over the window.

Corporal Ardoin testified that there were periodically random shootings in the neighborhood.

Sergeant Thaddeus Sices was also dispatched to 515 Orchid Drive. Upon his arrival, he was met by Corporal Ardoin. Sergeant Sices found thirteen .45 caliber spent shell casings approximately three to six feet away from the residence outside the two bedrooms. Four spent .45 caliber rounds were found inside the residence.

Sergeant Sices was shown Defense Exhibits 2 and 3, which were photographs taken inside the master bedroom depicting various items on the floor and the bed and the window coverings. He took the photographs before anything inside the room was moved. Things were subsequently moved so police could look for spent rounds. He did not attempt to look out the window of the master bedroom.

Sergeant Sices testified that the yard at the residence was "a little dark." He did not know the proximity of the closest street light and did not see a porch light.

Sergeant Sices indicated that police got calls regarding gunfire in the neighborhood, which involved "shooting in the air or something like that."

Officer Asher Reaux was also dispatched to respond to the Newport Street area regarding suspicious circumstances. His testimony regarding the statements made by a caller stating he was Kevin Alexander confirmed the testimony of Corporal Ardoin. Officer Reaux indicated those calls came from phone number (713) 876-3732.

Police later responded to a call from 515 Orchid Drive. The caller stated that Kevin Alexander was in the backyard shooting at the house. Upon his arrival, Officer Reaux observed bullet holes to the residence. He was informed that the shooter was in a black truck registered to one of the victims. Police were then given the name of the street on which the suspected shooter's mother lived.

Officer Reaux subsequently asked dispatch to patch him through to the cell phone number from which the first two 911 calls were made. Defendant answered the call, and Officer Reaux asked Defendant to meet him at the police department. Defendant initially agreed but called back to report that he would not show up. During those calls, Defendant was upset and angry and mentioned a situation with his kids. Officer Reaux subsequently went to the Moss Street address. Officer Reaux saw a black truck that was registered to one of the victims in the driveway of the Moss Street address. Officer Reaux parked a street over and subsequently saw the truck leave the residence.

Officers Reaux and Eaton pursued the truck in patrol units, which were marked with the word "Police", with their emergency lights and sirens activated. As Officer Eaton was pursuing Defendant, he informed dispatch that: "he was driving in excess of 100 as he was headed towards Pont de Mouton. And he advised that, I think he ran the red light at Moss and Ponte de Mouton as they turned left on Pont de Mouton to go towards the Thruway." Officer Eaton followed Defendant to Pont de Mouton, at which time Officer Reaux caught up with them. Defendant drove over 100 miles per hour on Moss Street, and the posted speed limit was believed to be 40 miles per hour. From Pont de Mouton, Defendant turned onto the Thruway, driving toward Interstate 10. At that time, Officer Eaton's vehicle overheated. Defendant subsequently turned onto Interstate

7

10 and headed west, with only Officer Reaux pursuing him. Dispatch subsequently contacted Officer Reaux and informed him that Defendant called and stated, "if we don't stop chasing him, he's going to kill somebody with his truck, he's going to run somebody off the road, he's going to kill himself." Defendant also stated that his children were with him, and "he was going to wreck the truck and kill them" if police did not stop chasing him.

Officer Reaux further testified that during the chase, Defendant would "stop really hard trying to get me to rear-end him," and he would take off again. The Defendant was also running cars off the road. Officer Reaux stated that Defendant "was swerving from lane to lane going off the road on both sides and the cars were, you know, going off in the median to avoid him as he was coming up behind them." Defendant was driving over 100 miles per hour at that time. Officer Reaux testified that when Defendant stated he was going to kill someone, "that's when he started going towards other drivers and, you know, they were pulling off the road to get away from him." The chase finally ended in Iowa in Calcasieu Parish after State Police laid out spike strips that blew Defendant's tires.

The truck was searched after Defendant was arrested, and police found an empty .45 caliber pistol magazine on the floorboard of the driver's side. However, the clip was not mentioned in Officer Reaux's report.

On cross-examination, Officer Reaux indicated there were no red lights between Moss Street and Interstate 49. However, there was one at Interstate 49. There were also no red lights between I-49 and Calcasieu Parish. There were no stop signs on the route either. Officer Reaux's report stated Defendant was swerving toward other vehicles but did not state other vehicles ran off the road due to Defendant's actions. He testified that he thought he wrote Defendant "swerved

8

violently towards other vehicles." He further testified, "They went off to the side of the road, pulled off into the median some of them, just went off the roadway on both sides to get out of the way."

Officer Reaux indicated that the cell phone used by Defendant was registered to Latonya Johnson.

Winnie Kurowski, an employee of the Acadiana Criminalistics Laboratory, was accepted as an expert in forensic DNA analysis as a forensic chemist. Kurowski tested a swab taken from the bottom of the magazine found inside the truck. A partial DNA profile was found on the swab, and Kurowski concluded, in the absence of identical twins, that Defendant was the source of the partial profile. She was at least 99.9 percent certain that this DNA profile would not be seen in a sample of 300 million selected unrelated individuals. She was also 99.9 percent certain Defendant could not be excluded as a possible source of the partial profile.

Margaret Bob testified that Defendant had previously lived with her family for a year and dated her daughter Teesha. However, he was not living with them at the time of the offenses. Teesha had four children with Defendant.

On April 22, 2014, Margaret was awakened by gunfire and bullets entering her bedroom. Her son Kenneth came into her room to ask if she and her husband were okay, and he peeped through the window and looked outside. Margaret did not see who fired the shots. Margaret indicated that the room in which her daughter Teesha and her children were sleeping was Kenneth's room. Margaret stated Defendant had passed in front of her home before the offenses occurred and told his nephew to go home because "he was gonna [sic] do some spraying."

Margaret stated that Defense Exhibit 2, a photograph of the master bedroom, depicted how the window coverings were at the time of the shooting, and all the items on the bed had been on the floor when shots were fired.

Sometime prior to April 22, 2014, Margaret's sons Emmanuel and Kenneth had gotten into a tussle that involved gun play.

Jennetral Robinson lived at 506 Orchid Drive, six houses from the Bobs, on April 22, 2014. At 3:00 a.m., she was sleeping on her sofa and heard gunshots. She ran to the door, opened it, and saw a young man running in front of her house and shooting a gun toward the coulee. She then called 911. The streetlight and her porch light were on. Robinson identified Defendant as the person she saw.

Teesha Bob had a fourteen or fifteen-year relationship with Defendant, and the two had four children together. Teesha testified that Defendant once lived in the Orchid Street home with her. As of April 22, 2014, the two had been separated for a couple of days. Teesha spoke to Defendant on April 21, 2014. She told Defendant that she would have lunch with him and allow him to see their kids but changed her mind based on Defendant's behavior. Defendant became upset. The two texted throughout that day. Teesha stated that Defendant's cell phone had a Houston number starting with 713, and it belonged to "[h]is other baby [sic] mama," Latonya.

On April 22, 2014, Teesha and three of her children slept in the bedroom next to the master bedroom. She heard gunshots followed by banging on the bedroom door. Kenneth then entered the room and went to the window. Kenneth was the only person who saw Defendant that night. Teesha indicated that the two beds in the room were close together. Additionally, there was only a blanket in the

window, as depicted in State's Exhibit 4. There was a sensor light outside the home, but she did not notice if it was on at the time.

The children were taken into the custody of the State after Defendant pulled a gun on Teesha's oldest child. This upset Teesha and her family. Teesha indicated that Defendant had gotten into a lot of disagreements with Kenneth, including a fight at Walmart for which Kenneth was arrested. The two never got along.

Kenneth Bob indicated that he knew Defendant because his sister had dated him. When asked if he got along with the Defendant, Kenneth stated, "[n]ot too much." Kenneth stated that he was walking down the street from his house on April 21, 2014, when Defendant, who was driving a truck, stopped him. The two "shared a couple of words." Kenneth testified that Defendant had a firearm at that time but did not threaten Kenneth.

Kenneth was in the bathroom at 3:00 a.m., when he heard gunshots. He went to his mother's room to check on his parents. While in that room, he looked out the window and saw Defendant. Kenneth testified that he clearly saw the person shooting, and the light by the room was on. Kenneth testified that the light was a "regular outside light" that his mother turned on every night. He immediately recognized Defendant and told his father it was Kevin. Kenneth saw Defendant again when he went to the room where his sister was sleeping. Kenneth's niece turned on the light in the room, and Defendant ran. Kenneth testified that he subsequently saw Defendant in court, and Defendant said to him, "'Y'all missed y'all's way to heaven.'"

On cross-examination, Kenneth admitted that his statement to police did not indicate he had gone into Teesha's room. Kenneth testified that Defendant was

11

wearing all black. However, his statement to police indicated the Defendant was wearing a black t-shirt, but he could not determine the color of Defendant's pants. He denied lying about the Defendant being dressed in all black. Kenneth insisted he told police what Defendant was wearing and that he went into Teesha's room.

Kenneth denied ever getting into an argument with his brother wherein shots were fired. He subsequently admitted to getting in a gunfight with his brother and stated, "That don't have nothing to do with what happened with me and him." He then admitted that his original answer was a lie. He subsequently denied lying about anything else. He also admitted getting into a fight with Defendant at Walmart but denied getting arrested. Kenneth said he fought with Defendant because Defendant hit Kenneth's sister and tried to hit Kenneth's mother.

Kenneth was questioned about his ability to see out the windows of the residence. He indicated that he was able to look through the corner of the blinds in his mother's room. Kenneth stated the items on the bed in Defense Exhibit 2 were on the floor of the room when the incident occurred.

Kenneth was shown State's Exhibit 6, an aerial view of the area surrounding the Bob residence, and was questioned as follows:

Q      Where did you see the person with the gun?

A      He was standing up right here (indicating).

Q      Now, the car, was the car there at the time?

A      The car --

Q      This was not taken that night that this happened?

A      Right. Right.

Q      Was it there? No?

A      Yes, it was there. That car was there.

Q      I just didn't know if that would confuse you because this picture wasn't taken the same day.

A      Okay.

Defense counsel discussed the car as follows:

Q      All right.  Was it there in 2014?

A      Yeah, it was right there -- it was right  here at that time.

Q      And was it there in 2015?

A      I don't know.

Q      Was it there in 2013?

A      It was there in 2014.

Q      Okay.  You understand where that photograph came from, right?

A      No.

Q      It's an Internet photograph.  It came off of Google Map.

Defense counsel told Kenneth that the photo was from 2015.  Kenneth then stated the car may not have actually been there in 2014.  Kenneth subsequently stated the car was not there at the time of the offenses.  He said he was not lying about the car being there.  He just had a bad memory.  He did not know when the car had been parked there, how long it was there, or when it was retrieved.

Kenneth was questioned on re-direct as follows:

Q      Is there any question in your mind regarding the person that you saw shooting at the house that night?

A      No.  I just had a feeling it was him.

Q      Okay.  Did you have a feeling or you knew it was him?

A      I had a feeling.

Q      You saw him?

13

A       Yeah, I saw him.  But I'm saying I had the weird feeling it was him.

Q       Is there any way you're mistaken about that?

A       I'm not mistaken about nothing.

*A. Aggravated Criminal Damage to Property*

"Aggravated criminal damage to property is the intentional damaging of any structure . . . wherein it is foreseeable that human life might be endangered, by any means other than fire or explosion."  La.R.S. 14:55.  Defendant does not contest the fact that property was damaged but alleges that the State failed to prove his identity as the shooter.

> As a general matter, when the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the state is required to negate any reasonable probability of misidentification. *State v. Smith*, 430 So.2d 31, 45 (La.1983); *State v. Brady*, 414 So.2d 364, 365 (La.1982); *State v. Long*, 408 So.2d 1221, 1227 (La.1982). However, positive identification by only one witness is sufficient to support a conviction. *See State v. Mussall*, 523 So.2d 1305, 1311 (La.1988) (generally, one witness's positive identification is sufficient to support the conviction); *State v. Ford*, 28,724 (La.App.2d Cir.10/30/96), 682 So.2d 847, 849–50, *writ denied*, 99–0210 (La.5/14/99), 745 So.2d 12.

*State v. Neal*, 00-674, p. 11 (La. 6/29/01), 796 So.2d 649, 658, *cert. denied*, 535 U.S. 940, 122 S.Ct. 1323 (2002).

In brief to this court, Defendant attacks the credibility of Kenneth Bob.  He points out that the only person in the residence to identify him was Kenneth; while testifying, Kenneth admitted that he had not been truthful; Kenneth acknowledged that he and Defendant had had altercations in the past; Kenneth's testimony regarding whether the car in the aerial photograph was present on the night of the offense was problematic; Kenneth's statement did not indicate he went into Teesha's room, but he later testified that he did; Kenneth's description of his

clothes differed; and Kenneth denied, but later admitted, he had gotten into an argument involving guns with his brother.

Defendant next addresses Kenneth's ability to see out of the windows of the residence. He claims testimony indicated the plethora of items seen on the bed in photographs of the master bedroom had been on the floor in front of the windows, making it difficult for Kenneth to access the windows. Additionally, the windows were covered, making it even more unlikely that Kenneth could have looked out of the windows. Defendant further argues that it would have been difficult for Kenneth to have cleared the area and looked out the window in either room in time to have seen the shooter. Defendant cites the testimony of Sergeant Sices, who indicated that it was dark outside and that there appeared to be no outdoor lights in the area.

Defendant next points out that Kenneth testified he had a "feeling" it was Defendant. He then said he saw Defendant but had a weird feeling it was him.

Defendant notes that, although his DNA was found on a .45 caliber magazine recovered from inside the truck he was driving, there was no evidence of when the DNA was placed on the magazine. Moreover, his hands and clothing were not tested for gunpowder residue, and his home was not searched for a weapon.

Defendant points out that Jennetral Robinson testified that she saw Defendant shooting from right in front of her home. However, police did not report recovering shell casings in that area. Additionally, her testimony, and that of Kenneth, differed as to the direction Defendant ran after the shooting.

Defendant argues that although the initial caller to 911 stated he was Kevin Alexander, there was no proof the caller was actually him. Moreover, the fact that

he answered the phone late that morning does not prove he had the phone before the shooting or that he placed the earlier calls to 911.

The State notes that merely because Kenneth's trial testimony was more detailed than his statement to police does not make him an incredible witness. The State points out that Kenneth's identification of the Defendant was unwavering. As to discrepancies regarding Defendant's clothing, the State asserts Kenneth's trial testimony reflected what he remembered at that time. The State noted the jury was free to accept or reject Kenneth's testimony in whole or in part, and clearly the jury chose to believe Kenneth.

As for the location of items in the bedroom, the State asserts that Defendant erroneously stated the items on the bed had been in front of the window. The State argues that no one testified that the items were in front of the window and would have prevented access to the window. Furthermore, the jury viewed the photographs. The jury clearly believed Kenneth's testimony that he looked out the corner of the window. In addition, Kenneth's testimony that he looked out the window in each room was supported by the testimony of Margaret and Teesha. Both Kenneth and Teesha testified that there was an outside light. Sergeant Sices testified the casings were located three to six feet from the bedroom windows. Jennetral Robinson also identified Defendant as the shooter. Because police did not look for casings in the area described by Robinson, does not mean that she lied.

The State also argues that there was circumstantial evidence to support his conviction. First, two threatening 911 calls made by a person identifying himself as Kevin Alexander were made prior to the shooting. The calls were made from (713) 876-3732, a telephone number registered to Latonya Johnson. Teesha testified that Defendant had been texting and calling her all night from a phone

16

belonging to Latonya.  The 911 calls were pinging off a cell tower located near 515 Orchid Drive.  Further, the offense occurred within one hour of receiving the 911 calls.  Defendant previously lived at the Orchid Drive residence and had been in a fourteen-year relationship with Teesha and had four kids with her.  The children were recently taken into the custody of the State, and Teesha had separated from Defendant.  Shots were fired into bedrooms, and Defendant was familiar with the residence.  Defendant answered the phone from which the first two 911 calls were dialed when contacted by dispatch.

Defendant fled when he encountered police.  Defendant again called 911 from the same number and threatened harm.  When the truck was stopped, it was occupied by Defendant, and a .45 caliber magazine containing his DNA was found therein.

We agree with the State.  Regardless of any inconsistencies in Kenneth's testimony and Kenneth's admission that some of his testimony was untruthful, the verdict indicates that the jury chose to believe his testimony as to the visual identification of Defendant as the shooter.  This court cannot second-guess that credibility determination.  Furthermore, positive identification by one witness is sufficient to support a conviction.  Moreover, the jury could have disregarded Kenneth's identification and based its verdict on Robinson's identification.  Alternatively, the jury could have disregarded the identification testimony of both Kenneth and Robinson and based its verdict on the circumstantial evidence presented by the State.  The circumstantial evidence was sufficient for the jury to find that Defendant was the shooter.

For these reasons, Defendant's conviction for aggravated criminal damage to property is affirmed.

17

*B. Aggravated Flight from an Officer*

Defendant alleges that the State failed to prove the elements of aggravated flight from an officer. Louisiana Revised Statutes 14:108.1 defines aggravated flight from an officer as follows:

> C. Aggravated flight from an officer is the intentional refusal of a driver to bring a vehicle to a stop or of an operator to bring a watercraft to a stop, under circumstances wherein human life is endangered, knowing that he has been given a visual and audible signal to stop by a police officer when the officer has reasonable grounds to believe that the driver or operator has committed an offense. The signal shall be given by an emergency light and a siren on a vehicle marked as a police vehicle or marked police watercraft.
>
> D. Circumstances wherein human life is endangered shall be any situation where the operator of the fleeing vehicle or watercraft commits at least two of the following acts:
>
> (1) Leaves the roadway or forces another vehicle to leave the roadway.
>
> (2) Collides with another vehicle or watercraft.
>
> (3) Exceeds the posted speed limit by at least twenty-five miles per hour.
>
> (4) Travels against the flow of traffic or in the case of watercraft, operates the watercraft in a careless manner in violation of R.S. 34:851.4 or in a reckless manner in violation of R.S. 14:99.
>
> (5) Fails to obey a stop sign or a yield sign.
>
> (6) Fails to obey a traffic control signal device.

Defendant notes that Officer Reaux testified regarding what he "believed he recalled Officer Eaton broadcast over the radio." However, Officer Reaux never saw Defendant run any red lights or ignore any stop signs. He also notes the discrepancy between Officer Reaux's testimony and his report as to whether Defendant left the roadway. When the issue was revisited on re-direct, Officer Reaux explained that cars pulled off into the median and some went off the

roadway on both sides to get out of the way. Defendant suggests that Officer Reaux's description does not indicate that he forced any other car to leave the roadway, and no other driver testified to support this conclusion. Defendant avers that a driver's reaction of moving a vehicle off the roadway does not equate to the driver being forced off the roadway.

Defendant notes that no other witness testified as to the events that occurred during the chase, and no recordings of the events were played. The jury was presented solely with the testimony of Officer Reaux, whose testimony was inconsistent with his report. Additionally, although there was testimony that Defendant told 911 he would ram into other cars, there was no evidence that he had actually attempted to do so.

Defendant also argues that Officer Reaux did not testify as to where various events occurred, specifically that the swerving or running others off the road occurred in Lafayette Parish.

The State asserts that it proved more than two acts that constitute circumstances wherein human life was endangered: 1) the Defendant exceeded the posted speed limit by more than twenty-five miles per hour; 2) he disregarded the traffic signal at Pont des Mouton and Moss Streets; 3) the Defendant left the roadway when he swerved from lane to lane; 4) he caused other vehicles to leave the roadway in order to avoid a collision; and 5) the Defendant left the roadway when he ran over the spike strip utilized by police. The State contends that the testimony of Officer Reaux alone is sufficient to prove the offense, and the jury clearly found that testimony credible. The State avers that La.R.S. 14:108.1 addresses a driver being forced from the roadway when the offending driver swerves toward that car.

The State argues that the events at issue occurred in Lafayette Parish, and if some of the events continued as Defendant entered other parishes, that does not mean the charge ends at the parish line and another charge should begin in the next parish. In support of that claim, the State cites La.Code Crim.P. art. 611, which discusses venue as follows:

> A. All trials shall take place in the parish where the offense has been committed, unless the venue is changed. If acts constituting an offense or if the elements of an offense occurred in more than one place, in or out of the parish or state, the offense is deemed to have been committed in any parish in this state in which any such act or element occurred.

The State also cites La.Code Crim.P. art. 612, which provides:

> If an offense is committed on a train, vessel, aircraft, or other public or private vehicle while in transit in this state and the exact place of the offense in this state cannot be established, the offense is deemed to have been committed in any parish through or over which the train, vessel, aircraft, or other vehicle passed, and in which the crime could have been committed.

The State asserts it adequately proved the offense began in Lafayette Parish.

Testimony indicated that police reasonably suspected Defendant of firing multiple gunshots into the Bob residence and that Defendant refused to stop his vehicle after being given signals to do so by marked police vehicles whose emergency lights and sirens were activated. Although Defendant was pursued by Officer Eaton, Officer Eaton was not called as a witness at trial. Officer Reaux testified that, while he pursued Defendant, Defendant exceeded the posted speed limit by more than twenty-five miles per hour. Although the State asserts that Defendant disobeyed the traffic signal at Pont des Mouton and Moss Streets, Officer Reaux reported that Officer Eaton stated, "I think he ran the red light." This is not sufficient to prove beyond a reasonable doubt that the Defendant failed to obey the traffic signal.

20

However, Officer Reaux went on to testify that Defendant "was swerving from lane to lane going off the road on both sides and the cars were, you know, going off in the median to avoid him as he was coming up behind them." Officer Reaux further indicated, in response to Defendant swerving violently toward other vehicles, that those vehicles "went off the side of the road, pulled off into the median some of them, just went off the roadway on both sides to get out of the way."

In *State v. Gatti*, 39,833 (La.App. 2 Cir. 10/13/05), 914 So.2d 74, *writ denied*, 05-2394 (La. 4/17/06), 926 So.2d 511, the defendant and others robbed the occupants of an armored car. The defendant, who was a passenger in a minivan, argued he was not guilty of aggravated flight because the robbery had ended and the group was merely taking someone to work when the pursuit occurred. During the pursuit, the defendant fired an AK-47 at a patrol unit that was chasing the minivan. One round struck the officer in the arm. In discussing the sufficiency of the evidence for aggravated flight from an officer, the court stated:

> This overlooks the fact that while Neal Thompson was driving 90 mph, Gatti was firing an AK–47 at the officer, *ultimately forcing him off the road*. A jury could have easily found that Gatti was directly involved in the commission of the crime of aggravated flight from an officer.

*Id.* at 85 (emphasis added). Based on this case, we find that Defendant's argument that a driver's reaction of moving a vehicle off the roadway does not equate to the driver being forced off the roadway is meritless.

Under La.Code Crim.P. arts. 611 and 612, Defendant's argument about where each element of the offense occurred is unfounded. Because the offense originated in Lafayette Parish, venue was proper there even if elements of the offense occurred in other parishes.

21

The verdict indicates that the jury chose to believe the testimony of Officer Reaux. Accordingly, any rational trier of fact, viewing the evidence presented in this case, in a light most favorable to the State, could find that the evidence proved beyond a reasonable doubt, that Defendant committed the crime of aggravated flight from an officer.

For these reasons, this assignment of error lacks merit.

III. *Assignment of Error Number Two*

In his second assignment of error, Defendant contends that the trial court erred in denying his motion for mistrial following the State's opening statement.

The State filed a "Notice of Intent Under Article 768" on December 28, 2016, indicating its intent to introduce "[a]ll statements made by defendant to 911 and/or police dispatch." On May 8, 2017, the State filed a "State's Notice Pursuant to Louisiana Code of Evidence Article 404(B) of Other Bad Acts the State May Use at Trial." A hearing on the 404(B) notice was held on May 9, 2017. At that hearing, the parties discussed several phone calls made by Defendant, including one made to 911 while he was driving on Interstate 10. Defense counsel argued that the "third phone call" was prejudicial because Defendant stated, "he's going to run into somebody." The State asserted that the remarks made during the aggravated flight were res gestae and went to the elements of the offense regarding his knowledge that he was being signaled by police to stop. The trial court found that Defendant's statements while he was driving on Interstate 10 were relevant and part of the State's proof of the elements of aggravated flight.

The following day, the State gave its opening statement in which it informed the jury that Defendant called dispatch and stated, "'Get those police officers away from me. Tell them to back off or I'm going to hurt myself or somebody else.'"

After the State's opening statement was complete, defense counsel asked for a conference outside the presence of the jury. Defense counsel then moved for a mistrial because the State referenced a confession or what could reasonably be interpreted by the jurors to be a confession without first establishing that the statement was freely and voluntarily made per La.R.S. 15:451, which states: "Before what purports to be a confession can be introduced in evidence, it must be affirmatively shown that it was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises." Defense counsel asserted that a pretrial determination regarding the admissibility of the statement was not made. Defense counsel specifically stated that he was not arguing the statement should be suppressed or complaining about notice by the State of its intent to use the statement. The State argued that the statement made by the Defendant was res gestae, because he called 911, and not a response to questioning by police. Defense counsel went on to argue that Defendant was confessing to at least one element of the offense of aggravated flight from an officer in his statement. The State again argued the statement was res gestae. The trial court subsequently denied the motion for mistrial, finding the statement at issue was not a confession but merely an acknowledgement of facts.

As previously noted, Officer Reaux testified that he was contacted by dispatch and told that Defendant called and stated, "if we don't stop chasing him, he's going to kill somebody with his truck, he's going to run somebody off the road, he's going to kill himself." Defendant also stated that his children were with him, and "he was going to wreck the truck and kill them" if police did not stop chasing him. There was no objection to Officer Reaux's testimony.

23

On appeal, Defendant cites La.R.S. 15:449 in support of his claim that the trial court erred in denying his motion for mistrial. Louisiana Revised Statutes 15:449 provides: "The term 'admission' is applied to those matters of fact which do not involve criminal intent; the term 'confession' is applied only to an admission of guilt, not to an acknowledgment of facts merely tending to establish guilt." He also cites La.R.S. 15:450, which states: "Every confession, admission or declaration sought to be used against any one must be used in its entirety, so that the person to be affected thereby may have the benefit of any exculpation or explanation that the whole statement may afford." Finally, Defendant cites La.R.S. 15:451, which, as previously noted, addresses the admission of a confession.

Defendant contends that the distinction between an admission and a confession is not always easy to determine. However, this matter involved a confession by Defendant. He argues that the State's reference to his statement falls within the ambit of La.Code Crim.P. art. 771. Louisiana Code of Criminal Procedure Article 771 provides:

> In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
>
> (1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770; or
>
> (2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
>
> In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.

24

Defendant contends that the remarks at issue were a confession; thus, the trial court should have admonished the jury or granted a mistrial.  The trial court did neither, and that was error.  Defendant argues that failure to give an admonition was not harmless; therefore, a new trial is warranted.  In support of this argument, the Defendant cites *State v. Calhoun*, 00-614 (La.App. 3 Cir. 11/2/00), 776 So.2d 1188, *writ denied*, 00-3309 (La. 10/26/01), 799 So.2d 1151.  In the opening statement in *Calhoun*, the prosecutor said, "It's a short case.  Unfortunately it's one that we've seen many times, I guess, in this state of affairs that we have; domestic violence.  And I want you to punish him for what anybody else does to anybody else."  *Id.* at 1196.  A request for an admonishment was denied.  On appeal, the defendant argued that the prosecutor's remarks were outside the scope of opening statements in violation of La.Code Crim.P. art. 766, which states that, "[t]he opening statement of the state shall explain the nature of the charge, and set forth, in general terms, the nature of the evidence by which the state expects to prove the charge."  This court went on to find the remarks warranted an admonishment; however, the error was harmless.  Defendant attempts to distinguish *Calhoun* and suggests the error was not harmless in the case at bar.

The State argues that the remarks at issue are not an inculpatory statement because the remarks were made during the commission of the offense and are not subject to La.Code Crim.P. arts. 767 and 768.  In support of its argument, the State cites several cases including *State v. Michel*, 422 So.2d 1115 (La.1982), wherein the supreme court stated that the term inculpatory statement as set forth in La.Code Crim.P. art. 767 "refers to out-of-court admission of incriminating facts made by a

25

defendant *after* the crime has been committed. It relates to past events." *Id.* at 1117.

We need not determine if Defendant's remarks made during the 911 call were an admission, confession, or inculpatory statement. In *State v. Benoit*, 17-187 (La.App. 5 Cir. 12/29/17), 237 So.3d 1214, the defendant moved for a mistrial after the state in its opening statement referenced the defendant's statements to police that he was a sex addict, that he thought the victim was telling the truth, and it was possible he committed the offense when he was drinking. Following these remarks, the defendant moved for a mistrial pursuant to La.Code Crim.P. art. 767. He argued there was no ruling as to the admissibility of the statements and the notices filed in court did not give the state authority to reference the statements during its opening statement. The trial court denied the motion for mistrial, reasoning defense counsel had notice and the purpose of Article 767 was not to be taken by surprise or prejudiced in preparing a defense. The fifth circuit addressed the trial court's ruling on the motion for mistrial as follows:

> A mistrial is a drastic remedy and, except in instances in which a mistrial is mandatory, is warranted only when trial error results in substantial prejudice to a defendant, depriving him of a reasonable expectation of a fair trial. State v. Licona, 13-543 (La. App. 5 Cir. 05/21/14), 141 So.3d 333, 339. Whether a mistrial should be granted is within the sound discretion of the trial court, and the denial of a motion for mistrial will not be disturbed absent an abuse of discretion. State v. Lagarde, 07-123 (La. App. 5 Cir. 05/29/07), 960 So.2d 1105, 1113-14, writ denied, 07-1650 (La. 05/09/08), 980 So.2d 684.

> La. C.Cr.P. art. 767 reads:

> The state shall not, in the opening statement, advert in any way to a confession or inculpatory statement made by the defendant unless the statement has been previously ruled admissible in the case.

> In State v. Lisotta, 97-407 (La. App. 5 Cir. 02/25/98), 712 So.2d 525, 527 the State in its opening statement said:

26

> You're also going to hear from Deputy Kuhn that this defendant made several statements at the time that he was arrested denying certain things, saying things that the State intends to show, prove, that he's guilty, exactly what we say he's guilty of.

> In <u>Lisotta</u>, defendant moved for a mistrial pursuant to La. C.Cr.P. art. 767 because any statements allegedly made by the deputy had not yet been deemed admissible. This Court found that the record showed that prior to trial, the State had filed a notice of its intent to use and introduce defendant's statements into evidence. This Court reasoned that the purpose of La. C.Cr.P. art. 767 is to prevent surprise and prejudice. Finding <u>State v. Strickland</u>, 683 So.2d 218 (La. 1996) controlling, this Court found that because the deputy's statement was admitted during trial, the State's premature mention of the statement in its opening statement to the jury caused no prejudice. See also, <u>State v. Roberts</u>, 06-765 (La. App. 3 Cir. 01/17/07), 947 So.2d 208, 230; <u>State v. Whitmore</u>, 353 So.2d 1286, 1288-1289 (La. 1977).

> Similarly, in this case, the record shows that the State filed a notice of its intent to use defendant's statements during opening statement and to introduce them into evidence and that defendant's statements were subsequently admitted into evidence at trial. We find that the State's premature mention of defendant's statements in the State's opening statement caused no real prejudice to defendant because the statements were later determined admissible at trial. Accordingly, the trial court did not abuse its discretion in denying the motion for a mistrial.

*Id.* at 1221-22 (footnote omitted). *See also State v. Roberts*, 06-765 (La.App. 3 Cir. 1/17/07), 947 So.2d 208, *writ denied*, 07-362 (La. 10/5/07), 964 So.2d 938.

In *State v. Strickland*, 94-25 (La. 11/1/96), 683 So.2d 218, *superseded by statue on other grounds*, La.Code Crim.P. art. 801, 2001 La. Acts No. 310 §1, which was cited in *Benoit*, the defendant argued the trial court erred in failing to declare a mistrial after the state referred to an alleged inculpatory statement during its opening statement. The issue was addressed by the supreme court as follows:

> The record reflects that during his opening argument, the prosecutor stated:

> You will hear [Atkin's] testimony as to when these two men entered the trailer as to what Lawson Strickland told them he had just done.

Vol. 4, p. 849. Defense counsel moved for a mistrial at a bench conference. The trial judge allowed the prosecutor to finish his opening statement and ultimately decided to deny the motion, finding the statement was part of the *res gestae* of the offense.

> At the time of trial, La.C.Cr.P. art. 767 provided:

> The state shall not, in the opening statement, advert in any way to a confession or inculpatory statement made by the defendant.

La.Acts 1995, No. 1278 amended the statute by adding "unless the statement has been previously ruled admissible." Even at the time of trial, however, a violation of the rule did not automatically require a mistrial. The purpose of the rule is to "prevent surprise and to allow adequate time for preparation of the defense, as well as to avoid certain problems that had been attendant to mentioning of confessions or inculpatory statements in the state's opening statement." *State v. Parker*, 436 So.2d 495, 499 (La.1983); *State v. Russell*, 416 So.2d 1283, 1288 (La.1982), *cert. denied*, 459 U.S. 974, 103 S.Ct. 309, 74 L.Ed.2d 288 (1982).

> In cases where the defendant knows through discovery of the state's intention to introduce the statement and the statement is later properly admitted, the prosecution's premature mention of the statement in its opening statement causes no prejudice to the defendant. *State v. Whitmore*, 353 So.2d 1286, 1289 (La.1977). Here, the defendant had pre-trial notice of the state's intention to introduce the statements. The trial judge properly admitted the testimony during trial. Thus, the defendant suffered no prejudice from the state's premature mention of his inculpatory statements in its opening statement. The trial judge did not err in denying the defense motion for mistrial.

*Id.* at 232-33 (alteration in original).

Based on the cases cited herein, Defendant suffered no prejudice from the State's mention of his statement to 911 in its opening statement, as Defendant received pretrial notice of the State's intent to use the statement and failed to object when testimony as to the statement was presented. In fact, when the objection was made after the State's opening statement, Defendant explicitly stated that he was

not arguing the statement should be suppressed or complaining about notice by the State of its intent to use the statement. For these reasons, this assignment of error lacks merit.

## DECREE

Defendant's convictions are affirmed. Defendant's sentence for aggravated flight from an officer is vacated, and the case is remanded for resentencing on that conviction. At resentencing, the trial court is directed to inform Defendant of the provisions of La.Code Crim.P. art. 930.8.

**CONVICTIONS AFFIRMED; SENTENCES AFFIRMED IN PART AND VACATED IN PART; CASE REMANDED FOR RESENTENCING WITH INSTRUCTIONS.**